DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Dennis Covey, appeals from the judgment of the Lorain County Court of Common Pleas which convicted him of aggravated riot. We affirm.
 I. {¶ 2} On June 11, 2002, the Lorain County Grand Jury charged Appellant with one count of aggravated riot, in violation of R.C.2917.02(A)(2) and one count of criminal damaging, in violation of R.C.2909.06(A)(1). Thereafter, Appellant pled not guilty and a jury trial was held. Appellant was found guilty on both charges and was sentenced accordingly.[1] It is from this decision that Appellant appeals, raising one assignment of error for review.
 II. Assignment of Error
"The finding that [appellant] was guilty of aggravated riot, a violation of [R.C. 2917.02(A)(2)] was against the manifest weight of the evidence and contrary to law."
 {¶ 3} In his sole assignment of error, Appellant maintains that his conviction for aggravated riot was against the manifest weight of the evidence presented at trial. More specifically, Appellant argues that "the testimony was clear" that Appellant did not "participate with four or more others in a course of disorderly conduct[,]" as R.C. 2917.02(A)(2) requires. We disagree.
 {¶ 4} "[A] manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citing Thompkins, 78 Ohio St.3d 380, 390 (Cook, J., concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Otten (1986), 33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 5} In the present matter, Appellant was found guilty of aggravated riot, in violation of R.C. 2917.02(A)(2). That section provides in pertinent part:
"(A) No person shall participate with four or more others in a course of disorderly conduct in violation of [R.C. 2917.11]:
(2) With purpose to commit or facilitate the commission of any offense of violence." R.C. 2917.02(A)(2).
 {¶ 6} One will be found to have acted purposely when "it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish whereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). This language does not require the State to establish that the four or more individuals acted in concert after they reached the campus. See State v.Brandon (June 28, 1989), 2nd Dist. No. 88 CA 57. Rather, the statute requires the State to prove that at least four "participate(d) . . . in a course of disorderly conduct[.]" See id.
 {¶ 7} Disorderly conduct consists of recklessly causing inconvenience, annoyance, or alarm to another by:
"(1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;
(2) Making unreasonable noise[;]
(3) * * * taunting or challenging another, under circumstances in which that conduct is likely to provoke a violent response;
(4) Hindering or preventing the movement of persons on a public street, road, highway, or right-of-way, * * * within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender.
(5) Creating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful purpose of the offender." R.C. 2917.11(A).
 {¶ 8} A person will be found to have acted in a reckless manner when, "with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).
 {¶ 9} Different versions of the events leading up to Appellant's conviction were presented at trial. Ryan Hartman ("Hartman"), the victim in this matter, testified that he was at a bonfire at his aunt's house, where he resided, on the evening of July 18, 2001. His girlfriend Renee Pesek ("Pesek") and his friends Brian and Brandy were also present. Later that evening, Hartman and Brian drove Brandy to her home in Eaton Estates. Pesek remained behind to care for their child. While driving through Eaton Estates, Hartman observed Jeremiah Covey ("Covey"), Charles Pierce ("Pierce"), and Shannon Vandergift ("Vandergift") standing outside Vandergift's residence. Hartman explained that he stopped to speak with Pierce as he had heard rumors that Pierce was sexually involved with Pesek. Pierce indicated that he was having an affair with Pesek and Hartman went home to speak with her. Hartman stated that Pesek asserted that the rumors were false.
 {¶ 10} Later that same evening, Hartman received a phone call from Covey. Hartman recalled becoming upset after speaking with him because he was unable to ascertain the truth about the rumors regarding Pesek and Pierce. He stated that he wanted "to find out the truth" and decided to go and talk to Pierce. Hartman and Brian then headed back to Eaton Estates around 1:30 a.m. the following morning. On the way, they picked up Charles Coventry ("Coventry") and Novy Laswell ("Laswell"). Hartman maintained that he did not know Pierce and Covey very well and was concerned that trouble could arise. Hartman stated that he had heard "stories" about Covey and Defendant and did not know what to expect. He brought his friends along for protection. They did not bring weapons of any sort.
 {¶ 11} Hartman stated that he parked his car on the street in front of Vandergrift's residence. He then began to walk up the driveway; the other three remained by the vehicle. When Hartman was halfway up the drive, he heard a "shuffle" coming from across the street. Hartman explained that he stopped, turned around, and headed back towards his vehicle. Defendant then appeared and "smash[ed]" Hartman's rear window with a baseball bat. Hartman recalled that as soon as his window was broken, approximately eight people then exited Vandergrift's house carrying weapons such as broomsticks, bats, and poles. As Hartman was attempting to start his vehicle so that he could leave, Covey ran to the driver's side of the car, carrying a bat, and tried to strike him. Hartman said that he was able to dodge the swings at first, but was eventually struck in the facial area with the bat. He eventually started his vehicle and drove further down the street. When he felt he had driven a sufficient distance from harm, Hartman then went back to pick up his friends. They then left the development. As they drove past Vandergrift's house, Hartman recalled that someone threw a bat at his car.
 {¶ 12} Upon leaving Eaton Estates, Hartman explained that he drove his friends home and then stopped at his aunt's house before heading to the hospital. When he arrived there, the police were on the scene. Apparently, Hartman had been speeding and the police had followed him; he was given a speeding ticket and an ambulance was called. Two of Harman's teeth were missing and one was broken. Hartman went to the hospital and received treatment. Thereafter, he spoke with Deputy James Jackson and filed a police report. The next morning, Hartman went to the police station with Coventry so that Coventry could give a statement. Hartman stated that although he was with Coventry, he did not help Coventry write or prepare his statement.
 {¶ 13} Laswell testified that on July 18, 2001, he was drinking at a friend's house when Hartman arrived. Hartman wanted Laswell to accompany him to Eaton Estates for protection; he was going to speak with Covey and thought he might be "jumped." Laswell went along to "make sure [Hartman] was safe." When they arrived at Eaton Estates, all four exited the car and Hartman began walking up Vandergrift's driveway. Laswell indicated that "before [Hartman] even got up to the door, [they] heard a bunch of screaming and running across the street[.]" Laswell stated that the next thing he saw was Defendant swinging a bat and breaking Hartman's car windows. Defendant was screaming and swearing, stating that "he wasn't putting up with this" and that he "doesn't have that in his neighborhood." Laswell recalled that there were seven to eight others gathering around and were all carrying weapons such as crowbars, pipes and baseball bats. When Hartman climbed back into his vehicle, Covey took the baseball bat from Defendant and began swinging at Hartman's face.
 {¶ 14} Coventry provided a written statement to the police also indicating that Defendant was responsible for breaking Hartman's car windows. However, while testifying at trial, he stated that he was no longer sure who broke the windows because he was drunk when it occurred and also drunk when giving his statement. Coventry maintained that he saw Defendant but did not see a baseball bat. He asserted that the written statement he provided to the police indicates otherwise because Hartman helped him complete it. Coventry acknowledged that he did not inform the prosecuting attorney of this matter though he had spoken with him on previous occasions.
 {¶ 15} Additionally, Coventry maintained that there were many people involved that evening. He testified that there were at least five others besides Hartman, Brian, Laswell and himself. However, the only fighting that occurred was between Hartman and Covey. Lastly, Coventry stated that he was currently in prison with Covey and admitted that he did not want to testify.
 {¶ 16} Deputy Jackson interviewed Hartman and received a statement from him regarding the events of July 18, 2001. Deputy Jackson's testimony revealed that the majority of Hartman's statement was consistent with his trial testimony. However, in his original statement to Deputy Jackson, Hartman indicated that only he and Coventry had gone to Eaton Estates that evening. While investigating the matter, Deputy Jackson discovered that Brian and Laswell were also present in Hartman's vehicle. Deptuty Jackson then interviewed Brian, Laswell and Coventry. Deputy Jackson stated that each of their accounts of the events was similar to Hartman's. Deputy Jackson asserted that although Hartman was present with Coventry on July 20th when Coventry gave his statement, Hartman did not speak with Coventry while he was preparing it. Deputy Jackson also recalled that Coventry did not appear intoxicated while at the station.
 {¶ 17} Covey, Jerry Hayes ("Hayes") and Defendant presented a different version of the events. Covey testified that while he was at Vandergrift's house, Hartman had called and threatened both himself and Vandergrift. Covey asserted that he did not call Hartman to threaten him, as Hartman's testimony suggested. Later that evening, Hartman and his friends were "banging" on Vandergrift's front door. Covey stated that he called Pierce as Hartman really wanted to speak with him. Covey further stated that while he was still inside, he heard "a whole bunch of people r[u]n to the street[;]" between four to seven people were in the middle of the road. Covey testified that he then ran outside with a baseball bat, "busted" Hartman's car windows and struck Hartman's face. Covey maintained that Defendant, his brother, did not do anything wrong and was just present in case things "g[o]t out of hand" Covey acknowledged that he previously stated to the prosecuting attorney that he only punched Hartman with his fist and did not break the car windows. He asserted, however, that he did not provide false information but simply did not tell him everything. Lastly, Covey stated that although he loves his brother and does not want him to go to jail, he would not lie to protect him. Covey was currently in the Richland Correctional Facility and serving his sentence for felonious assault which arose from this matter.
 {¶ 18} Defendant's cousin, Hayes, was also present at the scene. He stated Defendant woke him up and said that Covey needed some help because some people were trying to fight him. Hayes testified that he ran over to Vandergrift's but that the conflict was "more or less resolved" when he arrived. He asserted that he heard the car windows breaking but that Defendant was "nowhere near" the vehicle when the sound was heard.
 {¶ 19} Defendant testified that on the evening of July 18, 2001, he was at home sleeping when he received a call from his brother requesting help. Defendant stated that he then woke Hayes, Pierce and Eric and told them that Covey was in trouble. Defendant asserted that only he, Hayes and Pierce went to Covey's aid. As he was running to Vandergrift's house, Defendant was not sure if Covey was being attacked, so he yelled out "Aye, aye, aye, aye, aye, we're coming[,]" like "Houndini or Xena the Warrior Princess" to distract Hartman and his friends. He maintained that as he approached Vandergrift's house, he heard glass breaking. Hartman's car then sped off and Defendant observed Coventry speaking with Covey. Shortly thereafter, Hartman drove by again and someone from the vehicle threw a rock which struck Defendant's leg.
 {¶ 20} Defendant acknowledged that his testimony differed from Hartman's and indicated that Hartman was lying because "everybody was kind of laying it to his girlfriend." He was unable to explain, however, why Hartman would falsely accuse Defendant of such acts and not Pierce, who was the individual Hartman suspected as having an affair with his girlfriend.
 {¶ 21} After careful review of the record, we are unable to conclude that the trier of fact lost its way and created a manifest miscarriage of justice when convicting Appellant of aggravated rioting. Although conflicting testimony was presented, we refrain from overturning the verdict because the jury chose to believe testimony that was damaging to Appellant. A conviction will not be overturned as against the manifest weight of the evidence merely because the trier of fact believed the prosecution testimony. State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. Consequently, we find that Appellant's conviction was not against the manifest weight of the evidence. Appellant's assignment of error is overruled.
 III. {¶ 22} Appellant's assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
Carr, J. and Whitmore, J., concur.
[1] We note that the judgment entry of sentencing indicates that Appellant "appeared in [c]ourt for sentencing after having pleadguilty[.]" (Emphasis added.) However, we presume this to be a typographical error, as a jury trial was held and a verdict of guilty was returned.