[Cite as *State v. Hodge*, 2025-Ohio-4434.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                              :

          Plaintiff-Appellee,                    :

v.                                                         :

Andre J. Hodge,                                            :

          Defendant-Appellant.                   :

No. 23AP-463
(C.P.C. No. 22CR-1881)
and
No. 23AP-464
(C.P.C. No. 20CR-3790)

(REGULAR CALENDAR)

---

D E C I S I O N

Rendered on September 23, 2025

---

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Paula M. Sawyers*, for appellee. **Argued:** *Paula M. Sawyers*.

**On brief:** *Campbell Law, L.L.C.*, and *April F. Campbell*, for appellant. **Argued:** *April F. Campbell*.

---

APPEALS from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} In these consolidated appeals, defendant-appellant, Andre J. Hodge, appeals from judgments of the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding him guilty of aggravated robbery, robbery, aggravated riot, and kidnapping, and the trial court separately found him guilty of having a weapon while under disability.

I. Facts and Procedural History

{¶ 2} On August 17, 2020, appellant was indicted in Franklin C.P. No. 20CR-3790 on two counts of aggravated robbery in violation of R.C. 2911.01, four counts of robbery in violation of R.C. 2911.02, one count of felonious assault in violation of R.C. 2903.11, one count of aggravated riot in violation of R.C. 2917.02, and two counts of kidnapping in violation of R.C. 2905.01. Each count included a three-year firearm specification. On

April 29, 2022, appellant was indicted in Franklin C.P. No. 22CR-1881 on one count of having a weapon while under disability ("WUD") in violation of R.C. 2923.13.  On August 5, 2022, plaintiff-appellee, State of Ohio, filed a motion for joinder of cases, which the court subsequently granted.

{¶ 3}  On August 8, 2022, appellant filed a motion to dismiss the charges filed in case No. 22CR-1881, asserting a violation of his right to a speedy trial.  The state filed a memorandum contra, and the trial court denied the motion to dismiss prior to the start of trial.  On June 2, 2023, the state filed a motion to amend the indictment in case No. 20CR-3790, which the trial court orally granted on June 5, 2023.

{¶ 4}  The matter came for trial before a jury beginning on June 5, 2023.  At the start of trial, appellant waived his right to a jury trial as to the WUD charge in case No. 22CR-1881.

{¶ 5}  The first witness for the state was Lewis Root ("Root"), age 36.  Root is the husband of Michaela Root ("Michaela"), and they have four children.  Sherry Smith ("Sherry") is Root's younger sister; Timothy Hale is the father of Sherry's children.

{¶ 6}  On June 21, 2020, Root and his family were at their residence on Siebert Street, Columbus; Root testified that Sherry's children were staying with them because Sherry "was homeless" at the time, "so we stepped up to help her." (Tr. at 71.)  On that date, which was Father's Day, Root and other family members planned "to have a cookout and spend time together." (Tr. at 72.)  While sitting on the front porch, Root heard his phone ring and went inside to answer it.  The call was from Root's sister, Sherry, who told him "not to let Timothy Hale have the kids." (Tr. at 72.)  Sherry told Root "that her and Tim was arguing and not to give Tim her kids." (Tr. at 73.)

{¶ 7}  Root came back outside to the front porch, and "there was Timothy and his relatives." (Tr. at 73.)  Hale's truck was parked in front of Root's vehicle.  Root recognized some of Hale's sisters.  Root testified "one of the guys ran up on me, punched me in the back of the head" and began "yelling at me, telling me to call my sister and kept yelling about money that I knew nothing about." (Tr. at 73.)  After this individual punched him, Root "fell off the porch and that is when the other guy proceeded to start to hitting on me, too." (Tr. at 75.)  Root's wife "came to the door" and "[o]ne of them pulled a gun, said go back in the house; called her a bitch . . . said go back in the house." (Tr. at 75.)  Root's wife

"ran back in the house. Then she cracked the door, yelled for one of my neighbors to come outside." (Tr. at 75.)

{¶ 8} The neighbor, "Donny," lived "catty-corner" from Root. (Tr. at 75.) Donny "came out on the front porch," and "[t]hey redirected their energy towards him for a second." (Tr. at 76.) Donny "said that he . . . ain't have nothing to do with it. And they redirected their energy back . . . to [Root]." (Tr. at 76.) During the group's interaction with the neighbor, Root went back onto his porch. Root testified that "by this time, my wife had brought my firearm out and she handed it to me with the barrel to my hand instead of the butt of the pistol. And I tried to put the pistol down, like trying to de-escalate the situation." (Tr. at 76.) Root stated he did not point the weapon at anyone.

{¶ 9} As Root was standing in front of his screen door, two of the men came up onto the porch. Root testified: "I tried to put the gun behind my back so I can keep it from, you know, anything escalating more than what it already was. And that is when I got hit in the mouth with the pistol, another pistol, knocked my two front teeth out and I ended up having a concussion because I got hit multiple times in the face and head with the pistol." (Tr. at 77.) Root related "[t]hey stole" his weapon, a "Hi-Point 9" millimeter, "[t]hey got it out of my hands and took it," and they also took "[t]wo iPhones that we had just bought." (Tr. at 78-79.)

{¶ 10} Root further testified: "While I was being assaulted by the two guys, Michaela got drug off of the porch and was assaulted by the group of females and another guy." (Tr. at 77.) Michaela "was assaulted to the point where the two guys that were assaulting me went off the porch and then the one guy came back up, put the firearm back in my face, threatening to shoot me as he dropped his magazine." (Tr. at 79.) This was the same individual who "knocked my teeth out." (Tr. at 79.) The man was looking through Root's pockets "for anything else that I might have on me." (Tr. at 79.)

{¶ 11} The group of individuals then left the scene. Root's daughter "had already called the police." (Tr. at 80.) After the police arrived, Root was taken to the hospital. Root, who is "missing two teeth," has undergone "multiple surgeries" to his mouth "to remove bone fragments . . . from the gum line." (Tr. at 81.) He also suffered a concussion during the events, and missed a "month-and-a-half" of work due to pain. (Tr. at 82.)

{¶ 12} The Roots' residence was equipped with multiple security cameras, and the incident was captured on surveillance video. At trial, Root identified the state's exhibit

No. B-1 as a copy of the security video, and he also identified various photographic exhibits. During direct examination, the prosecution played the surveillance video and questioned Root about individuals and events depicted on the video and in still photographs taken from that video. One of the security cameras was directed at the sidewalk in front of Root's house, and the other security camera was directed at the "front porch facing [the front] door." (Tr. at 85.)

{¶ 13} Regarding the still photographs captured from the video, and introduced at trial as the state's exhibit Nos. B-2 through B-32, Root identified the state's exhibit No. B-3 as depicting "the first person punching me, knocking me down the steps." (Tr. at 92.) At trial, Root identified appellant as the individual who initially began punching him. Root testified the state's exhibit No. B-6 shows "my neighbor coming outside and the defendants running out towards the middle of the street threatening him because he came outside because my wife yelled for him." (Tr. at 93.) The state's exhibit No. B-9 depicts an individual "running back up" onto the porch after Michaela handed Root a firearm. (Tr. at 93.) The man returning to the porch (identified by Root as appellant) "had a pistol." (Tr. at 94.)

{¶ 14} Root testified the state's exhibit No. B-12 shows "[t]he other defendant . . . running up on the porch with a firearm in his hand as well," and the state's exhibit No. B-13 shows an individual "holding a pistol to my head." (Tr. at 95.) He stated the state's exhibit No. B-17 depicts "both" of these individuals "sitting there punching on me," (Tr. at 95-96.), and the state's exhibit No. B-18 shows "me getting my teeth knocked out" with a pistol. (Tr. at 96.) Root identified photographs in the state's exhibit Nos. B-19 and B-20 as depicting his wife Michaela being "drug off of the porch" and "being assaulted." (Tr. at 96.) He identified the state's exhibit No. B-22 as showing appellant "walking off the porch with my pistol in one hand and his pistol in the other." (Tr. at 96.) When asked if he fought back during the events, Root responded that he "[d]idn't really ever have an opportunity to." (Tr. at 90.)

{¶ 15} On cross-examination, Root stated that Timothy Hale arrived first, followed by two other vehicles. Root testified that all the individuals "walked up together." (Tr. at 107.) The individual in the white tank top was not assaulting Root's wife. An individual behind the man in the white tank top is seen picking up the phones of Root and his wife.

{¶ 16} On re-direct examination, Root stated a total of nine individuals arrived at his residence that day, and several of the females were related to Hale. Root identified appellant as the individual wearing the white tank top and who first came onto the porch and physically attacked him. Later, after Root's wife handed him the weapon, appellant "immediately ran up on me with his firearm." (Tr. at 122.) Appellant pointed the firearm "[t]o my head." (Tr. at 122.) Appellant motioned with his left hand for "the other guy to come on" up on the porch and help him. (Tr. at 123.) The second individual who was on the porch with appellant "kept pulling the trigger on that firearm, trying to fire the pistol, but he kept dropping the magazine." (Tr. at 120.) Appellant told Root to " '[p]ut the gun down,' " and when Root "tried to hide it behind [his] back . . . the other guy came up and hit me." (Tr. at 122.) Appellant walked away from the residence with Root's firearm. Root testified he did not believe he could walk off the porch and help his wife while the two individuals were on the porch confronting him.

{¶ 17} Michaela Root, age 29, testified as to the events that day. In June 2020, Michaela and Root, who have been married 11 years, resided on Siebert Street in Columbus with their four children. Michaela had "other children in my household at the time," including four children belonging to Root's sister, Sherry. (Tr. at 130.) Sherry's children, whose father is Timothy Hale, were staying at the Roots' house "because they had nowhere to go." (Tr. at 131.)

{¶ 18} On the date of the incident, 12 children were inside the residence. Michaela heard a "commotion," including "[y]elling, screaming," and went outside. (Tr. at 132-33.) Michaela observed "two men over top of my husband beating him to death and saying they was going to kill him." (Tr. at 133.) Michaela testified "they said they was going to come in the house and kill everybody in there." (Tr. at 133-34.) Michaela stated that her daughter, who "at the time was about . . . nine, ten . . . also had a gun pointed at her. It was a 16-year-old that had a gun pointed at her." (Tr. at 134.)

{¶ 19} During Michaela's testimony, the state played the surveillance video, and she described an individual wearing a black t-shirt "pulling a gun out and actually pointed it at me and that is when I went back in the house." (Tr. at 140.) Michaela stated the weapon "clip came out a couple of times and you could see the bullets." (Tr. at 141.) She testified "three of them . . . had firearms," the "one in the white shirt, the one in the black shirt," and

another individual who "had a revolver." (Tr. at 144.) Michaela identified Timothy Hale "in the black shorts." (Tr. at 139.) Two of the females were sisters of Hale.

{¶ 20} When Michaela came outside a second time, she "yelled for the neighbors." (Tr. at 142.) At that point, the male in the white shirt and the male in the black shirt went out into the street and "there was a gun pulled out while they walked over there." (Tr. at 143.)

{¶ 21} Michaela went inside the residence and brought out a weapon and handed it to her husband "[b]ecause I felt for my safety, my kids' safety, my house, everything." (Tr. at 145.) The man in the white shirt and the man in the black shirt then came up onto the Roots' porch. At that point, Michaela "was being dragged off of the front [porch] by the girl in the pink and another girl." (Tr. at 146.) She related "[t]hey're jumping me" as the male in the white shirt and the male in the black shirt "are jumping Lewis [Root] on the porch," and the "guy in black is running in his [Root's] pockets to see if we have any money or anything on us." (Tr. at 146-47.) Michaela was "being drug down the street by the whole crowd." (Tr. at 147.)

{¶ 22} Michaela testified the video shows "[t]he[m] pick[ing] up my two phones off of the ground, Lewis' and mine, the two phones that got picked up by the dude with no shirt," and then "the whole crowd follows all of the way down to where I am at, because I'm still on the sidewalk." (Tr. at 147.) She stated "[a]t one point they was all surrounding me as they was getting in the vehicle." (Tr. at 148.) Michaela testified that all of the individuals arrived together and they all left at the same time.

{¶ 23} At trial, the state played a recording of a 911 call placed by Root's 13-year-old daughter, K.S., during which K.S. stated: "There's these people outside, they just stole from my dad and my mom . . . they just stole my mom's gun and a phone." (Tr. at 155.)

{¶ 24} Michaela testified she suffered injuries during the incident, and received medical treatment. She identified photographs of her injuries, and described the injuries as "bruising all over my face and contusions." (Tr. at 158.) Michaela's husband "had to have surgery on his face. They had to go in and remove bone fragments. They had to pull his lip up, cut it . . . pull it all down, go in and remove bone fragments out of his jawline and they sewed it all together." (Tr. at 160.) He "had to eat and drink on a straw for three weeks." (Tr. at 160.)

{¶ 25} On June 21, 2020, at approximately 2:00 p.m., Columbus police officers were dispatched to the Roots' residence. Columbus Police Detective Phillip Thomas also went to the residence that day, and observed "blood on the porch." (Tr. at 178.) Detective Thomas interviewed the Roots, who appeared "traumatized and . . . injured." (Tr. at 179.) He described their injuries: "Mr. Root had missing teeth. His teeth were knocked out. He had a laceration to his lips and he was complaining of pain in his head and in his structure of his jaw, and . . . he suffered a palate fracture." (Tr. at 189.) Michaela "had abrasions and scrapes on her face." (Tr. at 189.) Detective Thomas took photographs of their injuries.

{¶ 26} The detective collected evidence including "[t]he video/audio, videography and the audio . . . attached with that." (Tr. at 179.) The video "was of good quality," and "included audio." (Tr. at 179.) The footage depicted two views of the area, "primarily . . . the front porch area and kind of a criss-cross viewpoint." (Tr. at 182.) Based on the information provided, "we developed persons of interest." (Tr. at 184.)

{¶ 27} Following deliberations, the jury returned verdicts finding appellant guilty of Count 1 (aggravated robbery), Count 2 (robbery), Count 3 (robbery), Count 8 (aggravated riot), and Count 10 (kidnapping); the jury found appellant not guilty of Counts 4, 5, 6, 7, and 9. The trial court separately found appellant guilty of the charge of WUD.

{¶ 28} On July 11, 2023, the trial court conducted a sentencing hearing and announced it would merge the aggravated robbery and robbery counts, run the sentences on Counts 1 and 10 consecutively, and run the sentence in case No. 22CR-1881 concurrent with the sentence in case No. 20CR-3790. The court also announced it would impose consecutive prison terms on two of the firearm specifications (and run the firearm specifications on the remaining counts concurrent to each other). By judgment entries filed on July 12, 2023, the trial court sentenced appellant in case No. 20CR-3790 to a total prison term of 25 to 27 and one-half years, and the court sentenced appellant to a term of 36 months in case No. 22CR-1881.

## II. Assignments of Error

{¶ 29} On appeal, appellant assigns the following seven assignments of error for our review:

> [I.] The trial court should have discharged Hodge from trial for speedy trial on Hodge's weapons while under disability offense.

[II.] The State's evidence against Hodge of kidnapping and aggravated riot is legally insufficient as a matter of law.

[III.] The evidence weighs manifestly against convicting Kidnapping and Aggravated Riot.

[IV.] The trial court committed reversible error in admitting testimony of an expert for Hodge's weapons while under disability offense under Crim.R. 16(K) and erred in admitting exhibits over Hodge's objection.

[V.] The trial court should not have amended Hodge's indictment. Nor should it have instructed the jury to convicted [sic] Hodge of Aggravated Riot for any other offense of violence than aggravated robbery.

[VI.] Hodge's offense and specifications should have been merged.

[VII.] Hodge's sentencing entry is void: The trial court erred in its sentencing entry because at the oral hearing, it ran all but two specifications concurrently, for an aggregate minimum sixteen year rather than twenty-five-year prison term.

## III. Analysis

{¶ 30}  Under the first assignment of error, appellant contends the trial court erred in failing to grant his motion for discharge in case No. 22CR-1881 based on speedy trial grounds.  Appellant argues the indictment for the WUD offense arose from the same set of facts as the 2020 case (and facts of which the state was aware at the time), and that any statutory tolling events with respect to the 2020 case do not apply to the 2022 case. According to appellant, more than 270 days passed before trial in case No. 22CR-1881, and the trial court therefore should have dismissed the WUD indictment.

{¶ 31} In response, the state argues appellant correctly notes that the facts underlying the WUD charge arose in June 2020 from the same facts as the charges in case No. 20CR-3790, and that the state was aware of such facts at that time.  The state maintains, however, appellant is incorrect as to his assertion that none of the tolling events in case No. 20CR-3790 apply to the 2022 case.

{¶ 32}  A criminal defendant is " 'guaranteed the constitutional right to a speedy trial pursuant to the Sixth and Fourteenth Amendments of the United States Constitution and

Ohio Constitution, Article I, Section 10,' " and Ohio's speedy trial statutes, R.C. 2945.71 et seq., "were implemented to enforce those constitutional guarantees." *State v. Watson*, 2013-Ohio-5603, ¶ 13 (10th Dist.), quoting *State v. Carmon*, 2012-Ohio-1615, ¶ 13 (10th Dist.).

{¶ 33} This court's "review of a trial court's decision regarding a motion to dismiss based upon a violation of the speedy trial provisions involves a mixed question of law and fact." *Id.* at ¶ 12, citing *State v. Fultz*, 2007-Ohio-3619, ¶ 8 (4th Dist.), citing *State v. Brown*, 131 Ohio App.3d 387, 391 (4th Dist. 1998). Accordingly, "[a]n appellate court must give due deference to a trial court's findings of fact if supported by competent, credible evidence, but independently review whether the trial court properly applied the law to the facts of the case." *Id.*

{¶ 34} Pursuant to R.C. 2945.71(C)(2), the state "must bring a defendant arrested on felony charges to trial within 270 days of his arrest." *Watson* at ¶ 14. If a defendant "is held in jail in lieu of bail on the pending charge, each day counts as three days." *Id.*, citing R.C. 2945.71(E) and *Carmon* at ¶ 14. If the accused "is not brought to trial within the speedy trial time limits, upon motion, the court must discharge the defendant." *Id.* at ¶ 14, citing R.C. 2945.73(B).

{¶ 35} An accused "establishes a prima facie case for dismissal based on a speedy trial violation when the defendant demonstrates that more than 270 days elapsed before trial." *Id.* at ¶ 14, citing *Carmon* at ¶ 15. Under Ohio law, "the 'proper standard of review in speedy trial cases is to simply count the number of days passed, while determining to which party the time is chargeable, as directed in R.C. 2945.71 and 2945.72.' " *Id.* at ¶ 14, quoting *Carmon* at ¶ 15. If a defendant establishes a prima facie case, "[t]he burden then shifts to the state to demonstrate that sufficient time was tolled pursuant to R.C. 2945.72." *State v. Geraci*, 2015-Ohio-2699, ¶ 19 (8th Dist.).

{¶ 36} Certain events "toll the accumulation of speedy-trial time." *State v. Beal*, 2021-Ohio-3812, ¶ 27 (5th Dist.). In this respect, "R.C. 2945.72 contains an exhaustive list of events and circumstances that extend the time within which a defendant must be brought to trial." *State v. Ramey*, 2012-Ohio-2904, ¶ 24. The tolling events set forth "therein include '[a]ny period of delay necessitated by . . . motion, proceeding, or action made or instituted by the accused[,]' R.C. 2945.72(E), '[t]he period of any continuance granted on the accused's own motion,' R.C. 2945.72(H), and 'the period of any reasonable continuance

granted other than upon the accused's own motion[.]' " *State v. Coleman*, 2022-Ohio-3808, ¶ 13 (9th Dist.), quoting R.C. 2945.72.

{¶ 37} This court has noted "[t]olling and waiver are distinct concepts that affect speedy trial calculations in different ways." *State v. Gonzalez*, 2009-Ohio-3236, ¶ 11 (10th Dist.), citing *State v. Blackburn*, 2008-Ohio-1823, ¶ 16. Specifically, "[a] waiver is a voluntary, intentional relinquishment of a known right," and "a defendant may waive his right to a speedy trial, and those days in which a defendant waives his right would not count toward the state's deadline." *Id.* at ¶ 12, citing *Blackburn* at ¶ 17. By contrast, tolling "occurs by operation of R.C. 2945.72 when certain circumstances occur," and a defendant "does not have to agree to the tolling of time; the tolling occurs by operation of the statute." *Id.*, citing *Blackburn* at ¶ 17.

{¶ 38} This court has also recognized, "[i]n the context of multiple indictments, an additional layer of speedy trial analysis may be required." *State v. Juarez-Hernandez*, 2012-Ohio-4835, ¶ 10 (10th Dist.). For purposes of the instant case, "[t]he distinction between tolling and waiver is significant because the Supreme Court of Ohio has determined that '[w]hen an accused waives the right to a speedy trial as to an initial charge, this waiver is not applicable to additional charges arising from the same set of circumstances that are brought subsequent to the execution of the waiver.' " *Gonzalez* at ¶ 13*,* quoting *State v. Adams*, 43 Ohio St.3d 67 (1989), syllabus. The Supreme Court "reasoned that an accused could not knowingly and intelligently relinquish speedy trial rights for charges not yet brought by the state, because the accused could not know how his decision in the first case could affect a subsequent case." *Id.*, citing *Adams* at 69.

{¶ 39} The Supreme Court, however, "does not treat time that is tolled in the same manner." *Id.* at ¶ 14. Rather, in accordance with its decision in *Blackburn*, "[t]ime that has been tolled in a previous case by operation of R.C. 2945.72 is also tolled in a subsequent case involving different charges based on the same underlying facts." *Id.*, citing *Blackburn* at ¶ 23. In *Blackburn*, the Supreme Court observed that "the justification for its decision in *Adams* did not apply to statutory tolling, because the tolling occurs by operation of statute and does not require a knowing and voluntary waiver." *Id.*, citing *Blackburn* at ¶ 19. Thus, "[u]nlike waiver, statutory tolling does not necessarily require an informed, tactical decision." *Blackburn* at ¶ 19.

{¶ 40} In the present case, the parties do not dispute the WUD indictment arose from the same set of facts as the 2020 case. As noted, appellant contends "[n]o tolling provision" with respect to the 2020 case "applies" to the 2022 case. (Appellant's Brief at 22.) In making this blanket assertion, appellant relies generally on a line of cases applying the Supreme Court's decision in *Adams* (discussed above), holding that "when an accused waives the right to a speedy trial as to an initial charge, this waiver is not applicable to additional charges arising from the same set of circumstances that are brought subsequent to the execution of the waiver." *Adams* at 70. Appellant's brief, however, does not cite to (or address) the Supreme Court's subsequent decision in *Blackburn*, in which the court "later explained that *Adams* was limited to cases involving speedy trial waivers and that waivers and tolling events are to be treated differently." *State v. Henderson*, 2018-Ohio-5124, ¶ 59 (7th Dist.), citing *Blackburn*, 2008-Ohio-1823, at ¶ 12-23.

{¶ 41} In response to appellant's argument, the state maintains that, while any speedy trial waivers appellant executed in case No. 20CR-3790 would not apply to case No. 22CR-1881, tolling events under Ohio's speedy trial statute would apply to the 2022 case. In accordance with the Supreme Court's decision in *Blackburn*, we agree. Therefore, because the charges in both cases "are based upon the same underlying facts and circumstances," we consider the tolling events from the first indictment (in the 2020 case) and "apply them" to the second indictment (in the 2022 case) in determining whether appellant's speedy trial rights have been violated. *State v. Otero*, 2023-Ohio-2807, ¶ 9 (9th Dist.), citing *Blackburn* at ¶ 23.

{¶ 42} The record reflects appellant was arrested on the warrant issued in case No. 20CR-3790 on August 24, 2020, and he posted bond on August 28, 2020. As indicated, under the triple count provision of R.C. 2945.71(E), each day during which a defendant "is held in jail in lieu of bail on the pending charge . . . counts as three days." *Watson*, 2013-Ohio-5603, at ¶ 14 (10th Dist.), citing R.C. 2945.71(E). Further, the date of arrest "is not chargeable to the state in computing speedy trial time." *Juarez-Hernandez*, 2012-Ohio-4835, at ¶ 8 (10th Dist.). As noted by the state, as appellant served four days in jail, 12 days of speedy trial time counted toward the WUD charge.

{¶ 43} On September 8, 2020, appellant made a demand for discovery in case No. 20CR-3790. A criminal defendant's "demand for discovery tolls the speedy trial time until the state responds to the discovery or for a reasonable time, whichever is sooner." *Geraci*,

2015-Ohio-2699, at ¶ 22 (8th Dist.). Courts have "generally considered 30 days to be a 'reasonable' response time when applying R.C. 2945.72." *Id.* at ¶ 26. This court has made similar findings. *See*, *e.g.*, *State v. Williams*, 2023-Ohio-1002, ¶ 19 (10th Dist.) (holding "the 21 days that passed" for the state to respond to defendant's discovery request are chargeable to defendant "and are not included in calculating his speedy-trial time").

{¶ 44} In the present case, the state filed an "identification of discovery provided" on October 6, 2020, indicating it submitted a "[d]iscovery packet" to counsel for appellant "on September 30, 2020." (Oct. 6, 2020 Identification of Discovery Provided at 3.) Here, we agree with the state that the 22 days between September 8 and September 30, 2020 would be tolled (and, correspondingly, a total of 10 additional days of speedy trial time elapsed prior to September 30, 2020, taking that total to 22 days).

{¶ 45} On October 22, 2020, the trial court filed a continuance entry upon motion of both parties for further negotiations, continuing the matter to November 30, 2020. This court has noted "continuances granted by a joint motion or agreement of the parties . . . toll the statutory time period." *State v. Glass*, 2011-Ohio-6287, ¶ 16 (10th Dist.). *See also Watson*, 2013-Ohio-5603, at ¶ 19 (10th Dist.) ("A continuance granted upon the joint motion of the parties tolls time pursuant to R.C. 2945.72(H) because the motion is made, in part, by the defendant."). Thus, prior to October 22, 2020, an additional 22 days of speedy trial time elapsed, raising the total to 44 days.

{¶ 46} On November 17, 2020, the trial court filed an entry of continuance stating the court "is unavailable for the currently scheduled trial date . . . due to the Franklin County Common Pleas Order in Response to the Covid-19 Public Health Emergency." (Emphasis omitted.) (Entry of Continuance at 1.) The entry, which continued the November 30, 2020 trial date to February 11, 2021, further stated: "The Defendant's speedy-trial time will be tolled for the period of this continuance under R.C. 2945.72(H)." (Entry at 1.)

{¶ 47} This court has observed "Covid-19 related continuances have been found to be 'reasonable' and therefore appropriately tolled under R.C. 2945.72." *State v. Childs*, 2024-Ohio-4699, ¶ 33 (10th Dist.), citing *S. Euclid v. Njoku*, 2022-Ohio-4388, ¶ 30 (8th Dist.), and quoting *State v. Lynum (In re Fleegle)*, 2020-Ohio-5636, ¶ 7. Other appellate courts have similarly held. *See*, *e.g.*, *State v. Smith*, 2024-Ohio-5168, ¶ 19 (4th Dist.) (trial court's sua sponte continuance of three months due to COVID-19 pandemic "was reasonable in purpose and length and tolled the speedy trial clock"); *State v. Virostek*,

2022-Ohio-1397, ¶ 92 (8th Dist.) (trial court's continuance of trial for approximately four months due to "ongoing pandemic . . . was reasonable under R.C. 2945.72(H)").

{¶ 48} The continuance at issue was in accordance with the Supreme Court's determination that "COVID-19 related orders and continuances tolling trials are permissible pursuant to R.C. 2945.72(H), which provides that speedy-trial time may be extended by 'the period of any reasonable continuance granted other than upon the accused's own motion' and that pandemic related continuances are 'reasonable.' " *S. Euclid* at ¶ 30, citing *Lynum* at ¶ 7. We therefore agree with the state that the trial court's continuance related to the COVID-19 pandemic constituted a tolling event of 87 days for purposes of speedy trial time.

{¶ 49} Following the trial court's continuance of the trial date to February 2021 due to the COVID-19 pandemic, a number of continuances were filed in case No. 20CR-3790 between February 2021 and June 13, 2022, either upon motion of appellant or upon joint motion of the parties. *See* Feb. 12, 2021 Continuance (upon motion of appellant for ongoing negotiations); Mar. 23, 2021 Continuance (upon joint motion of the parties for further negotiations); May 19, 2021 Continuance (upon motion of appellant for ongoing negotiations); Aug. 30, 2021 Continuance (upon joint motion of the parties); Nov. 1, 2021 Continuance (upon joint motion of the parties); Jan. 10, 2022 Continuance (upon joint motion of the parties and court for special panel); and June 13, 2022 Continuance (upon joint motion of the parties).

{¶ 50} As set forth under the facts, on April 29, 2022, appellant was indicted in case No. 22CR-1881 for one count of WUD. From the time of appellant's indictment in that case until June 13, 2022, a total of 45 days passed. The trial court's June 13, 2022 Continuance (noted above), filed upon joint motion of the parties in both case Nos. 22CR-1881 and 20CR-3790, reassigned the trial date to August 8, 2022.

{¶ 51} Thereafter, a number of further continuances were granted, either upon joint motion of the parties or upon motion of appellant, until the trial date of June 5, 2023. *See* Aug. 8, 2022 Continuance (upon joint motion of the parties); Sept. 28, 2022 Continuance (upon motion of appellant); Dec. 12, 2022 Continuance (upon joint motion of the parties); and Mar. 8, 2023 Continuance (upon joint motion of the parties).

{¶ 52} Again, appellant's speedy trial challenge on appeal does not address the Supreme Court's decision in *Blackburn*, 2008-Ohio-1823, including the distinction

between speedy trial waiver and statutory tolling provisions in the context of a "subsequent case involving different charges based on the same underlying facts." *Gonzalez*, 2009-Ohio-3236, at ¶ 14 (10th Dist.).[1] The state, relying on the *Blackburn* precedent, argues there was no speedy trial violation in the subsequent (WUD) case based on its contention that a total of only 89 days of speedy trial time passed as a result of tolling events (or a total of 176 days if this court were to conclude the continuances due to COVID-19 were not reasonable). Upon review of the record, and as outlined above, we agree with the state's argument there was no speedy violation in the 2022 WUD case based on "application of statutory tolling events." *Childs*, 2024-Ohio-4699, at ¶ 29 (10th Dist). Accordingly, the trial court did not err in failing to grant appellant's motion to discharge based on speedy trial grounds.

{¶ 53} Appellant's first assignment of error is not well-taken and is overruled.

{¶ 54} Appellant's second and third assignments of error are interrelated and will be considered together. Under these assignments of error, appellant challenges both the sufficiency and the weight of the evidence with respect to his convictions for kidnapping and aggravated riot.

{¶ 55} Under Ohio law, "[t]he legal concepts of sufficiency of the evidence and weight of the evidence involve different determinations." *State v. M.L.D.*, 2016-Ohio-1238, ¶ 45 (10th Dist.). In addressing a sufficiency challenge, "we construe the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt." *Id.*, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 56} In contrast to a sufficiency challenge, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution

---

[1] Despite language in the dissent asserting "sweeping application" of the Supreme Court's decision in *Blackburn*, 2008-Ohio-1823, the majority opinion does no more than rely on this court's prior precedent addressing and applying *Blackburn*, i.e., *Juarez-Hernandez*, 2012-Ohio-4835, at ¶ 12 (10th Dist.) (noting the Supreme Court in *Blackburn* "explained that the *Adams* waiver analysis does not apply to situations in which a defendant has taken an action that tolls the speedy trial time because the tolling provisions in R.C. 2945.72 apply regardless of whether the defendant waived time" and, "[t]hus, under *Blackburn*, any tolling periods attributable to appellant in the first case also applied to the subsequent case"); *Gonzalez*, 2009-Ohio-3236, at ¶ 14, 15 (10th Dist.) (citing *Blackburn* for the proposition that "[t]ime that has been tolled in a previous case by operation of R.C. 2945.72 is also tolled in a subsequent case involving different charges based on the same underlying facts" and, therefore, "because the charges in the common pleas court [in *Gonzalez*] arose out of the same underlying facts, time that was tolled for speedy trial purposes in the [earlier] municipal court cases would apply to his speedy trial rights in the common pleas court case").

of the conflicting testimony." *Id.* at ¶ 8, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A reviewing court "should reverse a conviction as against the manifest weight of the evidence in only the most 'exceptional case in which the evidence weighs heavily against conviction,' instances in which the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 57} We initially address appellant's challenges to the sufficiency and weight of the evidence supporting his kidnapping conviction. R.C. 2905.01(A) defines the offense of kidnapping and provides in part as follows: "No person, by force, threat, or deception . . . shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: . . . (2) [t]o facilitate the commission of any felony . . . [or]; (3) [t]o terrorize, or to inflict serious physical harm on the victim or another[.]"

{¶ 58} R.C. 2901.01(A)(1) defines "force" to mean "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." The Supreme Court "has defined 'threat' to include 'a range of statements or conduct intended to impart a feeling of apprehension in the victim, whether of bodily harm, property destruction, or lawful harm.' " *State v. Young*, 2013-Ohio-1247, ¶ 20 (10th Dist.), quoting *State v. Cress*, 2006-Ohio-6501, ¶ 39. Courts have defined the term to "terrorize" in accordance with "its ordinary and common usage: ' " 'to fill with terror [or] anxiety.' " ' " *Ohio v. Myers*, 2022-Ohio-991, ¶ 9 (9th Dist.), quoting *State v. Suggs*, 2016-Ohio-5692, ¶ 16 (9th Dist.), quoting *State v. Chasteen*, 2009-Ohio-1163, ¶ 21 (12th Dist.), quoting *State v. Eggleston*, 2008-Ohio-6880, ¶ 30, fn. 1 (11th Dist.).

{¶ 59} In the present case, in addition to instructing the jury on the elements of the crimes charged, the trial court instructed the jury that the state "has presented a theory that the defendant acted in complicity with the principal offender in the commission of aggravated robbery, robbery, felonious assault, aggravated riot, and/or kidnapping." (Tr. at 223.) R.C. 2923.03 defines complicity, and R.C. 2923.03(A) states in part: "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: (1) Solicit or procure another to commit the offense; (2) Aid or abet another in committing the offense[.]" In order to support a conviction for complicity by aiding and abetting, " 'the evidence must show that the defendant supported, assisted,

encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' " *State v. Word*, 2019-Ohio-1733, ¶ 31 (10th Dist.), quoting *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. R.C. 2923.03(F) states in part: "A charge of complicity may be stated in terms of this section, or in terms of the principal offense."

{¶ 60} Appellant maintains the evidence presented as to the kidnapping offense was insufficient to demonstrate either the "removal" or the "restraint" of Root. According to appellant, when he "first punched Root" (on the porch), "that was a misdemeanor assault and not a felony," and appellant argues he did not "move Root," as Root "explained" he "fell off the porch." (Appellant's Brief at 23.) Appellant further contends that when he subsequently "came back up on the porch," he did not restrain Root; rather, Root testified appellant "put his gun down as soon as Root put his down," and that "it was [a co-defendant] Jackson, not [appellant], that assaulted Root." (Appellant's Brief at 23-24.)

{¶ 61} In response, the state initially argues it is "clear from the record that the case was proceeding under a theory of complicity." (State's Brief at 26.) The state further asserts the evidence indicates appellant, by "violently attacking Mr. [Root], moved him from the porch to the yard," and such evidence supported a finding that appellant removed the victim by force. (State's Brief at 29.) The state also disputes appellant's assertion the evidence supported, at most, a misdemeanor assault. The state cites testimony by Root that the man who initially punched him (i.e., appellant) kept talking about money, and the state notes appellant can be heard on the surveillance video demanding money from Root at the time Root "was punched off the porch and was being assaulted in the yard." (State's Brief at 30.) The state argues the trier of fact could have also found the kidnapping by removal was for the purpose of terrorizing or causing serious physical harm to Root.

{¶ 62} The state further contends there was also sufficient evidence adduced of kidnapping by restraint. Specifically, the state asserts that appellant, acting in complicity with a co-defendant, restrained Root's freedom from moving off the porch to assist his wife, who at the time was being assaulted by other co-defendants. The state cites testimony by Root that he did not believe he could leave the porch to help his wife while being held at gunpoint by appellant and a co-defendant on the porch.

{¶ 63} With respect to the sufficiency of the evidence, a review of the record, including the testimony and video evidence presented by the state, indicates appellant,

upon arriving at the home of the Roots, went up onto their porch and began "punching" Root, "knocking [him] down the [front porch] steps" to the front yard area. (Tr. at 92.) At the time, appellant can be heard on the video yelling at Root, demanding money, while a co-defendant pulls out a weapon and tells Root's wife, Michaela, to "go back in the house." (Tr. at 75.) Root's wife then returns to the door and yells out to a neighbor for help, prompting appellant to momentarily turn his attention to the neighbor; the video depicts appellant and a co-defendant walking out into the street to confront the neighbor. The video also shows nine individuals gathered outside the Roots' house at the time.

{¶ 64} After this initial encounter, and while appellant is confronting the neighbor, Root is able to get up from the ground and go back onto his front porch. Appellant then returns to the Roots' front yard, and he briefly comes back onto the porch a second time, yelling at Root, before returning to the front yard. Root's wife, Michaela, then comes out to the porch and hands Root a handgun. The surveillance video shows appellant, while standing in the front yard, then pull out his own weapon, and run back up onto the porch; while the video shows Root holding his weapon down and behind his back, appellant points his firearm "[t]o [Root's] head." (Tr. at 122.) (State's Ex. No. B-13.) The video depicts appellant motioning with his left hand, and a co-defendant (Julius Jackson), who is also armed, comes up onto the porch and points his weapon at Root's head. As appellant and Root stand in front of the screen door, the co-defendant uses his firearm to strike Root in the mouth (causing him severe injuries, including the loss of two teeth).

{¶ 65} At the time of these events, the video depicts another individual (a female in a yellow top) come onto the porch and pull Michaela down to the front yard, where another female (in a red top) assists this individual in dragging Michaela to the ground; a third individual, a shirtless male, is shown kicking Michaela after she falls to the ground. Several individuals then drag Michaela down the sidewalk, past several houses, while striking her. The dual (side-by-side) camera angles from the surveillance video indicate, as Michaela is being pulled down the sidewalk, appellant and a co-defendant are on the porch with Root; the co-defendant is subsequently shown reaching into Root's pockets. Another individual (a shirtless male) picks up the cell phones of Root and Michaela, and appellant takes Root's weapon and places it in his pocket. During his testimony, Root stated he did not believe he could leave the porch to assist his wife while appellant and the co-defendant confronted him on the porch.

{¶ 66} As noted, in order to convict appellant of kidnapping, the state was required to show that he removed or restrained the victim by force, threat or deception, for the purpose of "facilitat[ing] the commission of any felony" or for the purpose "[t]o terrorize, or to inflict serious physical harm on the victim" R.C. 2905.01(A)(2) and (3). As also noted, the state maintains the evidence was sufficient for the factfinder to have found the elements of kidnapping under either a removal or restraint theory, i.e., that appellant removed the victim (Root) from the place where he was found (during the initial encounter on the porch) and/or that appellant restrained Root (during a subsequent encounter on the porch).

{¶ 67} With respect to the first theory, the evidence as outlined above indicates appellant, upon initially arriving at the Roots' residence, went onto their porch and began "yelling" at Root "about money," and telling Root to call his sister. (Tr. at 73.) Appellant then began punching Root "in the back of the head," and "knocking [him] down the steps" of the porch to the front yard area. (Tr. at 73, 92.) After Root fell from the porch, a co-defendant "proceeded to start hitting" Root as appellant continued to demand money. (Tr. at 75.) Root's wife came outside the residence, but a co-defendant "pulled a gun" and told her to go back inside the house. (Tr. at 75.)

{¶ 68} Under Ohio law, "[r]emoving an individual from the place where he or she is found means changing the individual's location." *State v. Turner*, 2024-Ohio-684, ¶ 53 (2d Dist.). The offense of kidnapping "does not depend on the distance a victim is removed or the manner the victim is restrained." *State v. Tatum*, 2001 Ohio App. LEXIS 810, *17 (10th Dist. Mar. 6, 2001) (forcibly moving individual "in various parts of the cab" sufficient to show removal by force). *See also State v. Mason*, 2002 Ohio App. LEXIS 1610, *9 (10th Dist. Apr. 11, 2002) (appellant's removal of victim from doorway of screened-in patio and forcing her onto patio table sufficient to show victim was "removed from the place where she was found"). Rather, the offense, " 'depends on whether the removal or restraint is such as to place the victim in the offender's power and beyond immediate help, even though temporarily.' " *Tatum*, quoting 1974 Committee Comment to R.C. 2905.01. Construing the evidence in a light most favorable to the prosecution, as required in considering a sufficiency challenge, the state presented evidence sufficient for a rational trier of fact to have found appellant forcibly removed Root from the place where he was found (i.e., from the porch to the front yard) with the purpose to commit a felony (i.e., robbery), and/or with the purpose to terrorize, or inflict serious physical harm to the victim.

{¶ 69} In addition, the state presented evidence by which the jury could have found that appellant, by force or threat (while acting in complicity with co-defendant Jackson), restrained the liberty of Root with the purpose to facilitate the commission of a felony and/or to terrorize, or inflict serious physical harm to the victim. Under Ohio law, "[r]estraining an individual's liberty means limiting or restraining their freedom of movement," and "[t]he restraint need not be for any specific duration or in any specific manner." *State v. Williams*, 2017-Ohio-5598, ¶ 19 (10th Dist.), citing *State v. Taylor*, 2015-Ohio-2490, ¶ 18 (10th Dist.). *See also State v. Walker*, 1998 Ohio App. LEXIS 4067, *5 (9th Dist. Sept. 2, 1998) ("the restraint involved need not be actual confinement, but may be merely compelling the victim to stay where he is"). Further, "[h]olding a victim at gunpoint can constitute both a threat and restraint." *State v. Friess*, 2023-Ohio-3409, ¶ 123 (6th Dist.).

{¶ 70} As outlined above, the testimony and surveillance video evidence indicates that appellant, after initially punching Root and removing him from the porch, turns and directs his attention to confronting a neighbor across the street (at which time Root is able to get up from the ground and go back onto his front porch). Appellant, after walking out into the street and arguing with the neighbor, then returns to the Roots' front yard, pulls out a weapon, and runs back up onto the front porch and points his firearm to Root's head; the surveillance video shows appellant motioning with one hand to a co-defendant (Jackson), who also comes onto the porch, points his weapon at Root and then strikes Root in the mouth with the firearm. Appellant then takes Root's weapon from him. At the time of these events, Root's wife is pulled off the porch by a female, and she is punched and kicked in the front yard by two females and one male; several individuals then drag Michaela down the street and continue to physically assault her. According to Root's testimony, he did not believe he was free to leave the porch to assist his wife while being confronted on the porch by appellant and the co-defendant. On review, the state presented sufficient evidence on which the jury could have reasonably concluded appellant restrained the victim's movement by force or threat.

{¶ 71} Based on the foregoing, we find unpersuasive appellant's contention the state presented insufficient evidence to prove he removed or restrained the victim. Further, with respect to appellant's manifest weight challenge, we do not find the jury lost its way or

created a manifest miscarriage of justice such that the kidnapping conviction must be reversed.

**{¶ 72}** Appellant next contends the evidence was insufficient to support his conviction for aggravated riot. Appellant argues the indictment identified the underlying offense of violence for the aggravated riot count as aggravated robbery, and therefore the state was required to prove appellant, in participating with four or more others, committed aggravated robbery. Appellant asserts the state did not prove this, as "[t]he only evidence was the video, which shows that only two people were engaged in aggravated robbery, [appellant], and [a co-defendant] Jackson." (Appellant's Brief at 24.)

**{¶ 73}** In response, the state argues appellant's contention that only two individuals were involved in the aggravated robbery, the underlying offense for the aggravated riot count, "is not accurate on several levels." (State's Brief at 31.) Specifically, the state notes the indictment for aggravated riot was amended "to include 'any offense of violence, to wit: Aggravated Robbery and/or Robbery and/or Assault and/or Menacing.' " (State's Brief at 31.) The state further maintains the evidence supports the jury's finding of guilt, as the video depicts nine individuals all participating in the events by yelling, screaming or physically attacking both Root and Michaela during the events at issue.

**{¶ 74}** R.C. 2917.02 sets forth the offense of aggravated riot. R.C. 2917.02(A)(2) states in part: "No person shall participate with four or more others in a course of disorderly conduct in violation of section 2917.11 of the Revised Code . . . [w]ith purpose to commit or facilitate the commission of any offense of violence."

**{¶ 75}** R.C. 2917.11(A) defines disorderly conduct as follows:

No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:

(1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;

(2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person;

(3) Insulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response;

(4) Hindering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender;

(5) Creating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender.

{¶ 76} In accordance with R.C. 2901.22(C), a person acts in a reckless manner when, "with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.01(A)(9) defines " '[o]ffense of violence' " to include "[a] violation of . . . [R.C.] 2911.01" (i.e., aggravated robbery), R.C. "2911.02" (i.e., robbery), R.C. "2903.13" (i.e., assault), and R.C. "2903.22" (i.e., menacing). Under Ohio law, "assault" is defined as "knowingly caus[ing] or attempt[ing] to cause physical harm to another." R.C. 2903.13(A). The offense of menacing is defined to mean "knowingly caus[ing] another to believe that the offender will cause physical harm to the person or property of the other person . . . or a member of the other person's immediate family." R.C. 2903.22(A).

{¶ 77} R.C. 2917.031 states as follows: "For the purposes of prosecuting violations of sections 2917.02 and 2917.03 of the Revised Code, the state is not required to allege or prove that the offender expressly agreed with four or more others to commit any act that constitutes a violation of either section prior to or while committing those acts." *See also In re R.H.*, 2017-Ohio-7852, ¶ 28 (9th Dist.), quoting *State v. Covey*, 2004-Ohio-30, ¶ 6 (9th Dist.) ("there is no statutory requirement that the participants in an aggravated riot 'act[] in concert' with each other").

{¶ 78} With respect to the sufficiency of the evidence as to aggravated riot, the state's evidence, including the surveillance video, indicates nine individuals arrived at the Roots' residence at approximately the same time. As previously outlined, upon arriving at the residence, appellant went up onto the porch and began punching Root, who fell from the porch to the front yard. Appellant is heard on the video demanding money, as a co-defendant "proceeded to start to hitting on [Root], too." (Tr. at 75.) Root's wife, after coming outside, is threatened by a co-defendant, who "pulled a gun, said go back in the

house; called her a bitch." (Tr. at 75.) Michaela testified the men "beating" her husband were "saying they [were] going to kill him," and "they said they [were] going to come in the house and kill everybody in there." (Tr. at 133-34.) Michaela stated that her daughter "also had a gun pointed at her." (Tr. at 134.)

{¶ 79} The surveillance video depicts Michaela again opening the door and yelling to a neighbor for assistance; appellant and a co-defendant then walk out into the street to confront the neighbor, and "there was a gun pulled out while they walked over there." (Tr. at 143.) Other members of the group momentarily turn and direct their attention to the neighbor. After confronting the neighbor, appellant comes back onto the Roots' porch, yells at Root, and returns to the front yard as other members of the group are also yelling toward the Roots' porch. After Michaela comes back outside to hand her husband a firearm, appellant pulls out his own weapon and runs back onto the porch and motions to a co-defendant, who also runs up onto the porch; both appellant and the co-defendant point weapons at Root, and the co-defendant then strikes Root in the mouth with a firearm.

{¶ 80} As also previously outlined, the video shows, at the same time Root is confronted on the porch by appellant and co-defendant Jackson, Michaela is being pulled off the front porch by a female wearing a yellow top; Michaela is then pulled to the ground by her hair in the front yard while being physically struck and kicked by three individuals, i.e., the female wearing the yellow top, a female wearing a red top, and a shirtless male who is depicted kicking Michaela after she is pulled to the ground. After Michaela is brought to her feet, the two females force her down the street, continuing to strike her while other members of the group surround the victim. All nine individuals leave the area together.

{¶ 81} Appellant's sufficiency argument as to aggravated riot addresses only one alleged offense of violence, i.e., aggravated robbery, and only one victim, i.e., Root. However, and as noted by the state, the indictment was amended to include other offenses of violence (i.e., robbery, assault, and menacing) and, as also previously noted, the state's theory of the case was that appellant acted in complicity with others in the commission of the offense.

{¶ 82} Here, viewing the evidence in a light most favorable to the prosecution, the record, as outlined above and depicted in the surveillance video (State's Ex. No. B-1), indicates a total of nine individuals arrived almost simultaneously at the Roots' residence. From the outset, these individuals, including appellant, begin yelling and threatening not

only Root, but Michaela and other members of the Root family (as well as a neighbor). Over the course of the events, at least five of these individuals, including appellant, are observed physically assaulting either Root or Michaela (who both suffered physical harm). On review, we conclude the state presented evidence on which a reasonable trier of fact could have found appellant participated with four or more others in a course of disorderly conduct (i.e., in recklessly causing inconvenience, annoyance, alarm, or risk of physical harm to Root, Michaela, and their family members) with the purpose to commit or facilitate the commission of any offense of violence (i.e., including assault and/or menacing). Accordingly, the evidence was sufficient to sustain the conviction for aggravated riot. As to the manifest weight, we do not find the jury clearly lost its way and created a miscarriage of justice in reaching its verdict.

{¶ 83} Based on the foregoing, appellant's second and third assignments of error are not well-taken and are overruled.

{¶ 84} Under the fourth assignment of error, appellant asserts the trial court erred in admitting expert testimony regarding the WUD offense and in admitting certain exhibits related to that offense over appellant's objection. Appellant's argument centers on the testimony of Amanda Fetherolf, the identification bureau manager for the Franklin County Sheriff's Office, who took appellant's fingerprints at the start of the bench trial on the WUD charge. Appellant argues the testimony of this witness should have been precluded under Crim.R. 16(K), which addresses expert witness reports and the remedies available to a court when a party fails to disclose such a report to the other party at least 21 days before trial. According to appellant, he had "no expert report" and, since the expert took his fingerprints on the day of trial, he had "no knowledge" of what the witness would even testify about. (Appellant's Brief at 28.)

{¶ 85} In response, the state argues appellant did not file a request for discovery in case No. 22CR-1881 and that, even if such a request had been made, the state provided the defense an expert report (prepared by Fetherolf) on July 22, 2022, setting forth "a comparison of Appellant's prints for his 2006 and 2009 convictions, as compared to his prints from the current case." (State's Brief at 36.) The state further maintains, in addition to Fetherolf's testimony, the evidence admitted as to the WUD count included (1) the records of appellant's prior convictions, (2) the fingerprints from those prior convictions, and (3) Fetherolf's fingerprint comparison report.

{¶ 86} In general, a trial court possesses "broad discretion over discovery matters, and appellate courts review decisions on discovery matters for abuse of discretion." *Hope Academy Broadway Campus v. White Hat Mgt., LLC*, 2013-Ohio-911, ¶ 23 (10th Dist.), citing *MA Equip. Leasing I, LLC v. Tilton*, 2012-Ohio-4668, ¶ 13 (10th Dist.).

{¶ 87} Crim.R. 16(K) states in part:

> An expert witness . . . shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion . . . . The written report . . . shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 88} In general, "[t]he purpose of Crim.R. 16(K) is to prevent 'either party from avoiding pretrial disclosure of the substance of expert witness's testimony by not requesting a written report from the expert, or not seeking introduction of a report.' " *State v. Ferricci*, 2022-Ohio-1393, ¶ 53 (8th Dist.). In *State v. Boaston*, 2020-Ohio-1061, ¶ 44, the Supreme Court noted that, effective July 1, 2010, "Crim.R. 16 underwent comprehensive changes in large part to strengthen the protections of a defendant's constitutional due-process rights to a fair trial." Further, "[a]s part of the rule's changes in 2010, Crim.R. 16(K) was adopted, requiring that expert witnesses generate written reports and that those reports be disclosed to the opposing party no later than 21 days before trial." *Id.* at ¶ 46. In *Boaston*, the Supreme Court held it was "error to admit expert-opinion testimony when the expert's opinion was not set forth in a written report prepared in compliance with Crim.R. 16(K)." *Id.* at ¶ 1. The Supreme Court ultimately concluded, however, under the facts of that case, "the trial court's admission of testimony that went beyond the scope of the expert's written report was harmless error." *Id.*

{¶ 89} As noted, the trial court separately conducted a bench trial on the WUD charge in case No. 22CR-1881. The indictment in that case alleged in part appellant had previously been adjudicated a delinquent (on March 30, 2006) for a crime that, if committed by an adult, would have been a felony, i.e., possession of crack cocaine; the indictment further alleged appellant had previously been convicted of a felony offense of violence on November 30, 2009, i.e., robbery. Prior to the state calling its first witness in

the bench trial, the prosecuting attorney requested that appellant's fingerprints be taken by their expert (Fetherolf). The trial court granted the request, and the state subsequently called Fetherolf as a witness.

{¶ 90} Fetherolf, the "ID Bureau Manager for the Franklin County sheriff's office," testified that she oversees "all . . . operations for the county jails for all of the ID technicians" that perform "fingerprinting, photographing, collection of DNA upon intake." (Tr. at 300.) During direct examination, Fetherolf stated she conducted a comparison of appellant's fingerprints, including a comparison prior to the date of trial. Defense counsel objected, citing Crim.R. 16(K) and the Supreme Court's decision in *Boaston*. Specifically, defense counsel argued that Crim.R. 16(K) "requires a report from an expert witness," and "[i]t says that unless I get that report within 21 days before trial, the testimony shall be precluded." (Tr. at 302.) In response, the prosecutor argued "the report which I have in my hand was provided in discovery" on July 22, 2022. (Tr. at 303.)

{¶ 91} Defense counsel maintained, however, the witness "is about ready to testify based on her expert opinion about something she just did." (Tr. at 303.) In addressing that assertion, the prosecutor stated the witness had "previously compared . . . to his [appellant's] prints for this case on file with the sheriff's department," and that "[t]his is a final step since there is not a stipulation to prove the defendant in the courtroom is, in fact, that same person." (Tr. at 303.) The trial court overruled defense counsel's Crim.R. 16(K) objection. Fetherolf then testified as to the fingerprint comparison analysis she had conducted in the instant case, and the witness identified various exhibits offered by the state regarding purported prior convictions related to appellant.

{¶ 92} On review of the record, even accepting appellant's contention the state did not strictly comply with Crim.R. 16(K) regarding testimony related to the fingerprints taken the day of trial, we find any error harmless. Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." In determining whether the state's failure to comply with Crim.R. 16(K) has prejudiced a defendant, the Supreme Court "has applied a three-prong analysis, questioning (1) whether the error had an impact on the verdict; (2) whether the error was harmless beyond a reasonable doubt; [and] (3) whether the remaining evidence establishes the defendant's guilt beyond a reasonable doubt." *State v. Carswell,* 2021-Ohio-3379, ¶ 57 (6th Dist.), citing *State v. Morris*, 2014-Ohio-5052, ¶ 27-29.

{¶ 93} In the present case, Fetherolf testified on direct examination that she had previously prepared a fingerprint comparison report. That report, admitted at trial as state's exhibit No. H-3, reflects arrest dates for Andre J. Hodge on March 6, 2006, and May 1, 2009, respectively, and also indicates that a record of his fingerprints was kept. In the report, Fetherolf opined "to a reasonable degree of scientific certainty that the fingerprint cards from the . . . arrests 05/01/2009 & 03/06/2006 were collected from the same source, Mr. Andre J Hodge DOB: 03/06/1989." (State's Ex. No. H-3, Fingerprint Analysis Report.) During Fetherolf's testimony, the state also admitted into evidence (1) a certified copy of a judgment entry indicating an entry of guilty plea by Andre J. Hodge to robbery in case No. 09CR-05-2789; (2) a certified copy of a judgment entry in case No. 06JU-03-3565, finding Andre J. Hodge to be a delinquent minor for having committed the offense of possession of crack cocaine; (3) fingerprint cards from the 2006 and 2009 cases; and (4) a booking sheet from the 2009 conviction which included a photograph and social security number for Andre J. Hodge.

{¶ 94} Fetherolf testified she had compared the fingerprint cards from the 2006 and 2009 cases to "the prints to the most recent booking for [appellant]." (Tr. at 308.) Fetherolf opined the fingerprints were identical, and the witness "believe[d] that the person here in custody is the same person . . . here on that most recent arrest because . . . the priors match and this matches." (Tr. at 309.)

{¶ 95} Here, even assuming the state failed to comply with Crim.R. 16(K), we find appellant cannot demonstrate prejudice as "the remaining evidence establishes appellant's guilt beyond a reasonable doubt." *State v. Blue*, 2021-Ohio-1703, ¶ 63 (5th Dist.) (appellant not prejudiced by state's failure to comply with Crim.R. 16(K) as any error in admitting testimony was harmless). Further, and in the context of a bench trial, we note " ' "a judge is presumed to consider only the relevant, material and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record." ' " *State v. Long*, 2021-Ohio-2656, ¶ 26 (10th Dist.), quoting *State v. Powell*, 2015-Ohio-4459, ¶ 20 (10th Dist.), quoting *State v. Johnson*, 2015-Ohio-3113, ¶ 91 (5th Dist.), citing *State v. White*, 15 Ohio St.2d 146, 151 (1968). *See also State v. White*, 2022-Ohio-2130, ¶ 45 (8th Dist.) (finding no plain error despite state's violation of Crim.R. 16(K), and recognizing "a trial judge is presumed to know the law and to have applied it accordingly").

{¶ 96} Appellant's fourth assignment of error is not well-taken and is overruled.

{¶ 97} Under the fifth assignment of error, appellant argues the trial court erred in amending Count 8 of the indictment (charging aggravated riot) and by instructing the jury to convict him of aggravated riot for any offense of violence other than the offense of aggravated robbery. According to appellant, while the grand jury indicted him for aggravated riot, with the underlying offense of violence being aggravated robbery, the amendment to add other underlying offenses of violence changed the nature and identity of the offense in contravention of Crim.R. 7(D).

{¶ 98} In response, the state argues the amendment did not change the name or identity of the charge; specifically, the state maintains appellant was always charged with one count of aggravated riot, a felony of the fourth degree, and that he remained charged with one count of aggravated riot following the amendment.

{¶ 99} Count 8 of the initial indictment, charging appellant with fourth-degree aggravated riot in violation of R.C. 2917.02, alleged in part that appellant, "on or about June 21, 2020, . . . did participate with four or more others in a course of disorderly conduct in violation of [R.C.] 2917.11 . . . with purpose to commit or facilitate the commission of any offense of violence, to wit: Aggravated Robbery, in violation of [R.C.] 2911.01." The state, on June 2, 2023, filed a motion to amend the indictment in case No. 20CR-3790. The motion included a request to amend Count 8 as follows: "After language 'to wit: Aggravated Robbery' ADD 'and/or Robbery and/or Assault and/or Menacing,' " and "[a]fter language 'section 2911.01' ADD 'and/or 2911.02 and/or 2903.13 and/or 2903.22.' " (June 2, 2023 Mot. to Amend Indictment at 1.) The trial court granted the motion to amend the indictment prior to the start of trial.

{¶ 100} Crim.R. 7(D) provides in part: "The court may at any time before, during, or after a trial amend the indictment . . . in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged." Accordingly, "a trial court may amend an indictment 'at any time' 'provided no change is made in the name or identity of the crime charged.' " *State v. Craft*, 2009-Ohio-675, ¶ 21 (12th Dist.). Under Ohio law, "[w]hether or not an amendment changes the name or identity of the offense with which one is charged is a matter of law." *Id.* at ¶ 22, citing *State v. Cooper*, 1998 Ohio App. LEXIS 2958 (4th Dist. June 25, 1998), citing *State v. Jackson*, 78 Ohio App.3d 479 (2d Dist. 1992). Such question "necessitates a de novo standard of review." *State v. Sharpe*, 2025-Ohio-440, ¶ 42

(4th Dist.), citing *State v. Kittle*, 2005-Ohio-3198, ¶ 12 (4th Dist.). If an amendment "does not change the name or identity of the crime charged," a reviewing court then applies "an abuse of discretion standard to review the trial court's decision to allow a Crim.R. 7(D) amendment." *Id*. at ¶ 43, citing *Kittle* at ¶ 13, citing *State v. Smith*, 2004-Ohio-4786, ¶ 10 (10th Dist.).

{¶ 101} In general, " ' "[t]he purposes of an indictment are to give an accused adequate notice of the charge, and enable an accused to protect himself or herself from any future prosecutions for the same incident." ' " *Id*. at ¶ 44, quoting *State v. Pepka*, 2010-Ohio-1045, ¶ 20, quoting *State v. Buehner*, 2006-Ohio-4707, ¶ 7. An indictment "need not articulate the precise underlying conduct giving rise to the offense where the indictment tracks the statutory language." *State v. Schmolz*, 2013-Ohio-1220, ¶ 10 (9th Dist.). Further, "[a] case in which the crime remains the same, even after amendment, does not violate Crim.R. 7(D)." *Sharpe* at ¶ 44, citing *Craft* at ¶ 23. Although "determining whether the 'name' of an offense has changed is a relatively simple undertaking, determining whether the 'identity' has been changed by the amendment presents a more difficult task." *Craft* at ¶ 23. In order "[t]o determine whether the 'identity' of a crime has been changed, the court must examine whether the 'penalty or degree' changed." *Sharpe* at ¶ 45, citing *Craft* at ¶ 24.

{¶ 102} In *State v. Davis*, 2008-Ohio-4537, ¶ 9, the Supreme Court held an amendment that changed the degree of an offense to a second-degree felony from a fourth-degree felony, "and altered the potential penalties as well," was not permitted by Crim.R. 7(D). By contrast, courts have held that an amendment to an indictment for WUD to correct the underlying charge that resulted in the disability from aggravated robbery to aggravated burglary "did not change the name or identity of the crime with which the appellant was charged," i.e., WUD. *State v. Watts*, 2024-Ohio-3385, ¶ 24 (5th Dist.). Similarly, an amendment "inserting the underlying offense of assault was proper under Crim.R. 7(D) where the nature and identity of the offense charged, aggravated burglary, was not changed and where [defendant] was on notice the state alleged an assault as one of the offenses it sought to prove at trial." *State v. Kidd*, 2020-Ohio-4994, ¶ 33 (8th Dist.). In *State v. Cunningham*, 2006-Ohio-6373, ¶ 18 (10th Dist.), this court held that amending a complaint charging an appellant with persistent disorderly conduct that "added . . . allegations that appellant 'recklessly cause[d] inconvenience [or] annoyance' to another by '[m]aking

unreasonable noise or an offensively coarse utterance, gesture or display' " did not change the identity of the offense as appellant "was still charged with persistent disorderly conduct."

{¶ 103} This court and other appellate courts have held that "[a]mending a rape charge from one type of sexual conduct to another type of sexual conduct changes neither the name nor the identity of the rape offense." *Smith*, 2004-Ohio-4786, at ¶ 11 (10th Dist.). *See also State v. Martin*, 2006-Ohio-2749, ¶ 9 (10th Dist.), citing *Smith* at ¶ 11 (amendment changing the sexual conduct alleged in rape counts from cunnilingus to digital vaginal penetration changed neither name nor identity of the rape offense); *State v. Jones*, 2015-Ohio-4116, ¶ 129 (2d Dist.) (state's amendment to gross sexual imposition count "did not change the name or identity of the charge, but merely amended the type of 'sexual contact' on which the charge was based").

{¶ 104} In the present case, we agree with the state that the name and identity of the offense remained the same after the amendment, as the amendment to include other underlying criminal "offense[s] of violence" changed neither the penalty nor degree of the offense and appellant was still charged with aggravated riot, a felony of the fourth degree. Having found the amendment did not change the name or identity of the crime charged, we thus "apply an abuse of discretion standard to review the trial court's decision to allow a Crim.R. 7(D) amendment." *Kittle*, 2005-Ohio-3198, at ¶ 13 (4th Dist.). In order to constitute reversible error, an appellant "must show not only that the trial court abused its discretion, but also that the amendment hampered or otherwise prejudiced appellant's defense." *Craft*, 2009-Ohio-675, at ¶ 27 (12th Dist.), citing *State v. Beach*, 2002-Ohio-2759, ¶ 23 (1st Dist.).

{¶ 105} We note appellant does not contend (nor did he argue before the trial court) that the amendment changed the way in which the defense prepared for trial. On this point, defense counsel argued before the trial court "it is not really a question of whether a defendant is surprised by that kind of evidence." (Tr. at 11.) Instead, appellant argued (and contends on appeal) that the grand jury never considered, apart from aggravated robbery, these other potential offenses of violence (i.e., robbery, assault and menacing).

{¶ 106} Appellant, however, was also indicted for robbery and felonious assault and, as noted by the state, assault is a lesser-included offense of felonious assault. *See, e.g., State v. Cartagena*, 2002-Ohio-7355, ¶ 30 (10th Dist.) (simple assault, "[a] lesser included

offense of felonious assault," occurs when "one knowingly causes or attempts to cause physical harm or recklessly causes another serious physical harm").

{¶ 107} Ohio courts also recognize that "every instance of serious physical harm by definition includes physical harm." *State v. Frazier*, 2010-Ohio-1507, ¶ 4 (2d Dist.) (rejecting argument that amendment of indictment charging defendant with felonious assault to delete the word "serious" resulted in a conviction "based on charges essentially different from those returned by the grand jury" because grand jury, in finding probable cause to believe appellant "attempted to cause 'serious physical harm' to the victims . . . necessarily found probable cause to believe he attempted to cause them 'physical harm' as well"). *See also State v. Pence*, 2024-Ohio-3067, ¶ 22 (11th Dist.) (appellant's argument that amendment "alters an 'essential phrase of facts' not in the indictment as presented to the grand jury neglects the fact that the grand jury's finding of 'serious physical harm' necessarily included the lesser included finding of 'physical harm' "). In a similar vein, while menacing is not a lesser-included offense to the indicted offenses, the offense itself requires another to believe the offender will cause "physical harm" to the other person. R.C. 2903.22. Under the evidence presented in this case, the grand jury would have heard evidence as to physical harm to another.

{¶ 108} Given the foregoing, and where the amendment did not change the name or identity of the charge nor alter the preparation of the defense, we find no abuse of discretion by the trial court in permitting the amendment. Accordingly, the fifth assignment of error is not well-taken and is overruled.

{¶ 109} Under his sixth assignment of error, appellant argues that all offenses and specifications, with the exception of the WUD offense, should have been merged by the trial court at sentencing. Specifically, appellant contends the trial court should have merged his convictions for aggravated robbery and kidnapping, as well as his convictions for aggravated riot and aggravated robbery, and he further contends the court should have merged the firearm specifications pursuant to R.C. 2929.14(B)(1)(b).

{¶ 110} R.C. 2941.25 states as follows:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 111} In considering a trial court's determination "as to whether offenses should merge under R.C. 2941.25, we review that decision under a de novo standard." *State v. Long*, 2021-Ohio-2656, ¶ 53 (10th Dist.). In *State v. Ruff*, 2015-Ohio-995, paragraph one of the syllabus, the Supreme Court held that courts, in "determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25," are required to "evaluate three separate factors—the conduct, the animus, and the import." In considering whether offenses merge, the Supreme Court further held:

Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

*Ruff*, at paragraphs two and three of the syllabus.

{¶ 112} Appellant initially argues the kidnapping offense merges with the aggravated robbery offense under the Supreme Court's decision in *State v. Logan*, 60 Ohio St.2d 126 (1979), syllabus (holding in part that where the restraint of movement of a kidnapping victim is merely incidental to a separate underlying crime, "there exists no separate animus sufficient to sustain separate convictions"). According to appellant, the state "argued at trial that Root's 'kidnapping' was [appellant's] act of aggravated robbery," and "[t]hus, it merges with aggravated robbery." (Appellant's Brief at 35.)

{¶ 113} In response, the state argues the trial court could have reasonably found, based on the evidence presented, two separate kidnapping and robbery offenses (with separate animus as to each) as argued before the trial court in the prosecution's sentencing

memorandum. The state further argues the evidence indicates the two separate actions resulted in separate harm to the victim (Root).

{¶ 114} The record indicates the prosecution, in its sentencing memorandum before the trial court, did not argue against merger of the robbery counts (Counts 2 and 3) with the aggravated robbery count (Count 1). The state asserted, however, the kidnapping count did not merge with the aggravated robbery count because "there are two separate incidents that form the basis of these offenses." (July 10, 2023 Sentencing Memo at 3.) Specifically, the state argued the first incident occurred when appellant, shortly after arriving at the Roots' residence, is seen on the surveillance video punching Root and knocking him off his porch (i.e., kidnapping by removal), and during these events appellant "stands over the victim and demands money." (Sentencing Memo at 4.) The state argued the animus for this incident was the demand for money, and that the conduct at issue "supports both the offenses of [k]idnapping and [r]obbery." (Sentencing Memo at 4.)

{¶ 115} The state further argued that, following the above altercation, there was a break in appellant's conduct, as he "walk[ed] away from the victim and the residence into the street to engage with a person on a porch across the street." (Sentencing Memo at 4.) Subsequently, however, appellant "reapproaches the house and another incident occurs" after Root's wife "brings a firearm out to protect the house and hands it to [Root]." (Sentencing Memo at 4.) During this incident, appellant and a co-defendant come onto the porch with their own weapons and hold Root by gunpoint (i.e., kidnapping by restraint); the co-defendant then strikes Root in the mouth with a firearm, resulting in serious injury, and "[t]his incident ends with [appellant] taking the victim's gun and leaving the porch." (Sentencing Memo at 4.) The state argued the animus for this second incident was to take the firearm from the victim, and that this conduct also "supports [k]idnapping and [r]obbery." (Sentencing Memo at 4.)

{¶ 116} The state thus argued before the trial court that the evidence presented at trial reflected "two incidents committed separately," with different harm and different animus. (Sentencing Memo at 4.) At the subsequent sentencing hearing, the trial court announced, "with respect to the kidnapping, I find that there is an additional separate animus for that and it was committed distinctly from the aggravated robbery." (Tr. at 336.)

{¶ 117} On review, we agree with the state's contention the trial court could have found two separate incidents (including two separate kidnapping offenses) for purposes of

the merger analysis. With respect to the initial incident, and as previously discussed in our sufficiency review of the kidnapping offense, there was evidence upon which the trier of fact could have found appellant forcibly removed Root from the porch with the purpose to commit a felony (i.e., demanding money from Root) and/or with the purpose to terrorize, or inflict serious physical harm to the victim.

{¶ 118} We further found, with respect to subsequent conduct by appellant (occurring after he left the front yard area and walked into the street to confront a neighbor, thereby allowing Root to get up and go back onto his porch), evidence to support a finding that appellant, having chosen to return to the Roots' residence, went back onto the porch and restrained Root's movement by force or threat, i.e., by holding a weapon to the victim; during this latter incident, after a co-defendant also comes onto the porch and strikes Root in the mouth with a firearm, appellant is observed taking Root's weapon, while another co-defendant is observed taking two cell phones belonging to the victims. Here, the trial court could have reasonably concluded the animus (or motive) that prompted appellant to remove Root from the porch during the initial encounter was different from the motive to restrain Root and take his weapon during the second incident, i.e., the first offense was not merely incidental to the subsequent offense, and had independent significance.

{¶ 119} While the trial court found a separate animus sufficient as to each offense to support separate convictions, the record also supports the state's argument that Root suffered different harms from the offenses. Specifically, during the initial encounter, when appellant forcibly removed Root from the porch, appellant is shown on the surveillance video punching Root in the head. Such harm was separate from that caused by the subsequent incident when appellant, after confronting the neighbor, returned to the Roots' porch and held Root at gunpoint, during which a co-defendant struck Root in the mouth with a weapon, causing Root to suffer serious physical harm as well as the deprivation of his firearm (and cell phones). Thus, the record reflects that each of the offenses resulted in a separate, identifiable harm.

{¶ 120} Because the record supported a finding that the offenses at issue each had a separate animus and caused separate, identifiable harm, the trial court did not err in failing to merge the offenses of kidnapping and aggravated robbery at sentencing.

{¶ 121} Appellant also contends the trial court erred in failing to merge the aggravated riot count with the aggravated robbery count. In asserting those counts merge,

appellant argues he had "no part to play" in what happened to Michaela, and maintains "when he committed the act of violence of aggravated robbery, that formed the basis of his aggravated riot conviction." (Appellant's Brief at 35-36.)

{¶ 122} In response, the state argues the aggravated riot conviction would not merge with the aggravated robbery conviction as it was "committed with separate animus, was committed separately, and involved a second victim who suffered separate harm." (State's Brief at 50.) We agree.

{¶ 123} Appellant's argument, which focuses solely on aggravated robbery as an underlying offense of violence (and on only one of the victims, i.e., Root), fails to address other underlying offenses of violence alleged (including assault and menacing) as well as the evidence presented. As previously addressed, the record reflects nine individuals arrived almost simultaneously at the Roots' residence, and from the outset these individuals, including appellant, began yelling and threatening not only Root, but also Michaela (and other members of the Root family as well as a neighbor). The evidence indicates at least five individuals, including appellant, engaged in threatening conduct toward Root and Michaela that ultimately resulted in physical harm to both victims (and alarm to others at the residence as reflected by the 911 call placed by Michaela's daughter). As also noted by the state, the surveillance video depicts appellant come onto the porch three times, two times for the purpose of robbing Root, and a third time just to intimidate him. Upon review, the record supports the state's argument the offenses were committed with a separate animus or motive.

{¶ 124} Further, in accordance with *Ruff*, two or more offenses of dissimilar import exist "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff*, 2015-Ohio-995, at paragraph two of the syllabus. *See also State v. Dumas*, 2015-Ohio-2683, ¶ 35 (7th Dist.) ("*Ruff* specifically held that dissimilar import exists when the crimes involve separate victims."). As argued by the state, Root and Michaela were both victims of the aggravated riot offense, and the record indicates each suffered a separate harm. In light of the foregoing, the trial court did not err in failing to merge the offenses of aggravated riot and aggravated robbery.

{¶ 125} Finally, appellant contends the trial court erred in failing to merge the firearm specifications pursuant to R.C. 2929.14. Appellant maintains that

R.C. 2929.14(B)(1)(b) limits a trial court's ability to impose sentences for multiple firearm specifications attached to felonies committed as part of the same act or transaction. Appellant notes the state argued at trial that the court was required to impose prison terms on two specifications based on the Supreme Court's decision in *State v. Bollar*, 2022-Ohio-4370. According to appellant, *Bollar* is distinguishable because, in the instant case, he did not plead guilty and "cannot be 'convicted' of mergeable offenses." (Appellant's Brief at 39.)

{¶ 126} In response, the state argues the offenses were not committed as part of the same act or transaction, and that R.C. 2929.14(B)(1)(g) specifies that two firearm specifications must run consecutive to each other. Further, the state maintains, the Supreme Court in *Bollar* held, even in instances where offenses would merge, if there are multiple firearm specifications a trial court must impose at least two of the specifications pursuant to R.C. 2929.14(B)(1)(g).

{¶ 127} As noted under the facts, at the sentencing hearing the trial court imposed consecutive sentences on two of the firearm specifications (and ran the firearm specifications as to the remaining counts concurrent). R.C. 2929.14(B)(1)(g) addresses a trial court's "imposition of sentence for firearm specifications when an offender has been found guilty of multiple felony offenses (and at least one is a felony listed in the statute) and multiple firearm specifications." *State v. Smith*, 2025-Ohio-679, ¶ 77 (2d Dist.).

{¶ 128} R.C. 2929.14(B)(1)(g) states in relevant part as follows:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are . . . aggravated robbery, . . . and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 129} Upon review, we agree with the state's argument that the Supreme Court's decision in *Bollar* is dispositive of the issue raised by appellant. As observed by one appellate court, the decision in *Bollar* "specifies that R.C. 2929.14(B)(1)(g) requires the offender to receive prison terms for the two most serious firearm specifications when the

offender is found guilty or pleads guilty to several felony offenses and at least one of which is a felony specified by the statute and also is found guilty of multiple accompanying offenses and that the statute 'makes no exception to the application of its provisions when one of the underlying felony offenses has been merged.' " *State v. Smith*, 2024-Ohio-5986, ¶ 16 (3d Dist.), quoting *Bollar*, 2022-Ohio-4370, at ¶ 19. *See also State v. Martin*, 2024-Ohio-2172, ¶ 10, fn. 1 (8th Dist.) ("Imposing sentences on two of the firearm specifications, one of which was attendant to a merged offense, is required under the combined application of R.C. 2929.14(B)(1)(g) and . . . *Bollar*.").

{¶ 130} We find unpersuasive appellant's attempt to distinguish *Bollar* on the basis that, unlike the defendant in *Bollar*, because he "did not plead, he cannot be 'convicted' when counts merge.' " (Appellant's Brief at 39.) Ohio appellate courts have addressed and rejected similar arguments seeking to distinguish the holding in *Bollar*, including *State v. Mingo*, 2024-Ohio-543, ¶ 52 (9th Dist.), in which the Ninth District Court of Appeals observed that the Supreme Court in *Bollar* "explained . . . that 'convicted' as used in R.C. 2929.14(B)(1)(g) means 'found guilty[,]' " and that, contrary to the appellant's assertion, "*Bollar* does not only apply in cases where the defendant pleaded guilty." *Mingo* at ¶ 52, quoting *Bollar* at ¶ 16. *See also State v. Cherry*, 2024-Ohio-5344, ¶ 101 (2d Dist.) (following *Mingo's* interpretation of *Bollar* in holding trial court properly imposed prison terms for firearm specifications following the appellant's jury trial conviction). We therefore conclude the trial court properly applied R.C. 2929.14(B)(1)(g) and the holding in *Bollar* in imposing consecutive prison terms on two of the firearm specifications.

{¶ 131} Based upon the foregoing, appellant's sixth assignment of error is not well-taken and is overruled.

{¶ 132} Under his seventh assignment of error, appellant asserts the trial court's sentencing entry is void as it fails to reflect what took place at the sentencing hearing. Appellant argues the trial court announced at the hearing it would run all but two specifications concurrently, for an aggregate minimum sentence of 16 years, but the court's subsequent sentencing entry states a minimum prison term of 25 years.

{¶ 133} The record indicates the trial court conducted a sentencing hearing in both case Nos. 20CR-3790 and 22CR-1881 on July 11, 2023. At that hearing, the court announced in part, with respect to case No. 20CR-3790, it would "impose as to Count 1, five years incarceration . . . with a mandatory three-year firearm specification," and that it would

"merge Counts 1, 2, and 3 together." (Tr. at 335.) The court further announced "[a]s to Count 8, I will impose a 12-month term," and "as to Count 10 . . . the F-1 would be five to seven-and-a-half indefinite sentence . . . with a three-year firearm specification." (Tr. at 335-36.) The court stated it "will run the specifications as to Counts 2, 3 and 8 concurrent . . . [s]o you will have a maximum six years mandatory as to the firearm specifications." (Tr. at 336.) The court also stated it "will run sentences 1 and 10 consecutive to each other," and "run the sentences on Count 8 concurrent." (Tr. at 336.) Finally, the court announced it would impose a 36-month sentence on the WUD conviction in case No. 22CR-1881, and "run that sentence concurrent with the sentence I impose under 20CR-3790." (Tr. at 337.)

{¶ 134} The trial court's sentencing entry in case No. 20CR-3790, filed on July 12, 2023, states in part as follows:

> The Court hereby imposes the following sentence: the Defendant shall serve an indefinite minimum term of FIVE (5) YEARS as to Count One, THREE (3) YEARS as to the Firearm Specification in Count One, THREE (3) YEARS as to the Firearm Specification in Count Two, THREE (3) YEARS as to the Firearm Specification in Count Three, TWELVE (12) MONTHS as to Count Eight, THREE (3) YEARS as to the Firearm Specification in Count Eight, an indefinite minimum term of FIVE (5) YEARS as to Count Ten, and THREE (3) YEARS as to the Firearm Specification as to Count Ten.
>
> Count One shall be served concurrently with Count Eight, concurrently with Case Number 22CR-1881, consecutively to Count Ten, and consecutively to the Firearm Specifications in Counts One, Two, Three, Eight, and Ten, for a total indefinite prison term consisting of a minimum of TWENTY-FIVE (25) YEARS with the potential maximum prison term of TWENTY-SEVEN (27) YEARS AND SIX (6) MONTHS . . .

{¶ 135} The state on appeal concedes appellant's argument that "the trial court's sentencing entry is void, as the sentence imposed is not the sentence that was verbally announced at his sentencing hearing." (State's Brief at 53.) Specifically, the state acknowledges the total prison sentence imposed by the trial court at the sentencing hearing was 16 to 18 and one-half years (with 6 years being mandatory due to the two firearm specifications), and that such pronouncement was not reflected in the court's sentencing entry, which ordered consecutive prison terms on all firearm specifications, for a total prison term of 25 to 27 and one-half years.

{¶ 136} Under Ohio law, "[a] defendant is entitled to know his sentence at the sentencing hearing." *State v. Dinka*, 2022-Ohio-1365, ¶ 8 (12th Dist.), citing *State v. Santiago*, 2015-Ohio-1824, ¶ 19 (8th Dist.). Further, "[a] trial court cannot impose a sentence in the sentencing entry that differs from that it imposed at the sentencing hearing." *State v. Vaughn*, 2016-Ohio-3320, ¶ 18 (8th Dist.). *See also Dinka* at ¶ 8 ("A trial court errs when it issues a judgment entry imposing a sentence that differs from the sentence pronounced in the defendant's presence.").

{¶ 137} This court has held that "a substantive discrepancy between the sentence imposed at a sentencing hearing and the sentence reflected in a sentencing entry requires a new sentencing hearing." *State v. Smith*, 2018-Ohio-3875, ¶ 7-8 (10th Dist.), citing *State v. Small*, 2015-Ohio-3640, ¶ 44 (10th Dist.) (where trial court indicated at sentencing hearing it was imposing an aggregate prison term of two years and six months, but the court's judgment entry imposed an aggregate prison term of three years and six months, "matter must be remanded for resentencing" in view of such variance). *See also State v. Stutes*, 2023-Ohio-4582, ¶ 38 (4th Dist.) ("trial court made a substantive discrepancy of imposing consecutive sentences at the disposition hearing but ordering the sentences to be served concurrently in the sentencing entry," thus requiring "a new sentencing hearing").

{¶ 138} Accordingly, we sustain appellant's seventh assignment of error and remand the matter for resentencing in case No. 20CR-3790.

## IV. Conclusion

{¶ 139} Based on the foregoing, appellant's first, second, third, fourth, fifth and sixth assignments of error are overruled, the seventh assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas in case No. 22CR-1881 is affirmed, the judgment in case No. 20CR-3790 is affirmed in part and reversed in part, and this matter is remanded to that court for further proceedings in accordance with law and consistent with this decision.

*Judgment in case No. 22CR-1881 affirmed;*
*Judgment in case No. 20CR-3790 affirmed in part and reversed in part;*
*cause remanded for resentencing.*

DORRIAN, J., concurs.
EDELSTEIN, J., concurs in part and dissents in part.

EDELSTEIN, J., concurring in part and dissenting in part.

{¶ 140} I respectfully dissent from the majority decision's conclusions regarding the statutory speedy trial analysis in this case and would sustain appellant's first assignment of error and remand this matter for further proceedings. And although I agree with the majority decision's determination that the state's amendment to the indictment did not change the name or identity of the aggravated riot offense charged, I write separately to address limitations to the court's ability to fully analyze appellant's fifth assignment of error in light of the way it presents to this court.

{¶ 141} Initially, I believe it is prudent to acknowledge that recent legislative amendments have changed the way Ohio's statutory speedy trial scheme applies to felony offenses. Effective April 4, 2023, the Ohio General Assembly amended R.C. 2945.73 to change the procedure for handling situations where a defendant is not brought to trial within the 270-day statutory time limit. *See* 2022 Am.Sub.S.B. No. 228.

{¶ 142} Prior to the amendment, R.C. 2945.73(B) provided that: "Upon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code." Former R.C. 2945.73(D) further provided that "[s]uch discharge is a bar to any further criminal proceedings against [the accused] based on the same conduct." The majority decision applies the former version of R.C. 2945.73 to its analysis of appellant's first assignment of error.

{¶ 143} Under the amended version of R.C. 2945.73(C), however, a defendant who is not brought to trial for a *felony* offense within the statutory time limit "is eligible for release from detention" (as opposed to being discharged from criminal liability). R.C. 2945.73(C)(1). The statute provides that such defendant must be brought to trial within 14 days after his or her motion to dismiss on speedy-trial grounds is filed and served upon the prosecutor. R.C. 2945.73(C)(2). If no motion is filed, the defendant must be brought to trial within 14 days after the trial court determines the statutory speedy-trial time limit has expired. *Id.* Only if the defendant's case is not tried within that 14-day grace period are the defendant's criminal charges to be dismissed with prejudice. *Id.* The 14-day grace period can be extended at the request of the accused or due to the fault or misconduct of the accused. *Id.*

{¶ 144} The foregoing amendment to R.C. 2945.73 went into effect while appellant's case was pending. Case law from other appellate districts suggests the former version of R.C. 2945.73 would have applied to appellant's case. *See, e.g., State v. Knott*, 2024-Ohio-2289, ¶ 47-54 (2d Dist.). And the parties have not argued otherwise on appeal. In the absence of any such arguments, I concur in the majority decision's application of former R.C. 2945.73 while also highlighting the potentially limited application of this decision to future cases given this significant change to Ohio's statutory speedy trial law.

{¶ 145} Turning to the merits of the issue presented here, there is no question that appellant established a prima facie violation of former R.C. 2947.73(B). It is undisputed that the date from which speedy-trial calculations begin is August 24, 2020, the date appellant was arrested on his initial case (the "2020 case"). It is also undisputed that the WUD charge indicted on April 24, 2022 (the "2022 case") arose from the same facts as the original charges and the state was aware of the facts giving rise to the WUD charge at the time of the 2020 indictment. *See, e.g., State v. Adams*, 43 Ohio St.3d 67, 68 (1989); *State v. Baker*, 78 Ohio St.3d 108, 110-11 (1997); *State v. Parker*, 2007-Ohio-1534, ¶ 20; *State v. Mohamed*, 2009-Ohio-6658, ¶ 30 (10th Dist.). Both cases proceeded to trial on June 5, 2023.

{¶ 146} Applying former R.C. 2945.73, appellant was clearly indicted and tried for the WUD offense more than 270 days after his initial arrest for the charges filed in the 2020 case. Once the statutory time limit has expired, the defendant has established a prima facie case for dismissal. *State v. Butcher*, 27 Ohio St.3d 28, 31 (1986). The burden then shifts ***to the state*** to show that the time for bringing the defendant to trial was properly extended under R.C. 2945.72 or that the defendant waived his statutory right to a speedy trial. *See id.* Extensions of speedy trial time are to be strictly construed against the state. *State v. Singer*, 50 Ohio St.2d 103, 109 (1977), citing R.C. 2901.04(A).

{¶ 147} The majority decision finds that appellant's reliance on *Adams* is improper because the delays were the result of statutory tolling, not waiver. And, according to the majority decision, the two concepts are different. With respect to waiver, *Adams* precluded the application of a waiver executed on an original charge to new charges on the same facts because a defendant's waiver must be made ***knowingly*** and ***intelligently*** to be effective. *Adams* at 69, citing *State v. Kidd*, 60 Ohio App.2d 374, 376 (1st Dist. 1978), and *State v. O'Brien*, 34 Ohio St.3d 7, 9 (1987). The state concedes that any speedy trial waiver executed

in the 2020 case would not apply to the WUD charge subsequently filed in the 2022 case. (*See* Majority Decision at ¶ 41.) Thus, the only question that remains is whether the statutory tolling events that took place in the 2020 case should toll the speedy-trial time for the WUD charge filed in the 2022 case.

{¶ 148} With respect to the tolling of speedy-trial time, R.C. 2945.72 provides an exhaustive list of specifically enumerated events that automatically extend the statutory speedy trial time by tolling the time period while that event occurs. *See*, *e.g.*, *State v. Ramey*, 2012-Ohio-2904, ¶ 24. The majority decision is correct in generally noting that tolling events from appellant's 2020 case *may* also apply to his 2022 WUD charge. (Majority Decision at ¶ 41.) But I disagree with the majority decision's sweeping application of the Supreme Court of Ohio's decision in *State v. Blackburn*, 2008-Ohio-1823, as a basis for finding that *all* of the statutory tolling events occurring in the 2020 case apply to the 2022 case. In my view, *Blackburn* does not have as broad an application as it is given by the majority decision today.

{¶ 149} In *Blackburn*, the court was confronted with an issue distinct from the one presented here. In that case, the state filed three separate cases stemming from one incident against the defendant. In the first case, Blackburn was arrested for and charged with the illegal conveyance of weapons or prohibited items onto the grounds of a detention facility or institution. *Id*. at ¶ 3. After the first case was dismissed without prejudice at the state's request, Blackburn was charged in a second case with the same offense as well as one count of conspiracy. *Id*. at ¶ 3-4. During the second case, Blackburn filed a motion for continuance because he had retained new counsel, who needed additional time to prepare. *Id*. at ¶ 5. After the second case was dismissed at the state's request without prejudice, Blackburn was charged in the third case with two counts of felony trafficking in drugs and one count of conspiracy. *Id*. at ¶ 6-7. During the third case, Blackburn moved for discharge of all charges based on the state's failure to bring him to trial within 270 days of his arrest in the first case. *Id*. at ¶ 8.

{¶ 150} After the trial court granted Blackburn's motion and dismissed all charges in the third case, the state appealed to the Eleventh District Court of Appeals. *See State v. Blackburn*, 2007-Ohio-1071 (11th Dist.). During that appeal, the state acknowledged that the charges in all three cases arose from "essentially the same underlying facts and circumstances." *Blackburn*, 2007-Ohio-1071, at ¶ 9 (11th Dist.). *See also Blackburn*, 2008-

Ohio-1823, at ¶ 11.  The appellate district court held that "R.C. 2945.72(E) does not apply to toll speedy trial in prior indictments for purposes of subsequent indictments filed by the state when each indictment contains different charges arising under the same set of facts." *Blackburn*, 2007-Ohio-1071, at ¶ 21 (11th Dist.).

{¶ **151**} Thus, the "narrow issue" before the Supreme Court was whether to include the delays resulting from defense motions filed in Blackburn's second case in calculating his speedy-trial time for the subsequently indicted third case.  *See Blackburn*, 2008-Ohio-1823, at ¶ 12.  To answer that question, the court issued an equally narrow holding: "in calculating the time within which a criminal defendant must be brought to trial under R.C. 2945.71, periods of delay resulting from motions filed by the defendant in a previous case also apply in a subsequent case in which there are different charges based on the same underlying facts and circumstances of the previous case." *Id*. at ¶ 23.

{¶ **152**} Most notably, the *Blackburn* court made a deliberate point ***not*** to overrule its prior decision in *State v. Homan*, 89 Ohio St.3d 421 (2000), *superseded by statute on other grounds.  See Blackburn* at ¶ 12, 20-21.

{¶ **153**} *Homan* presented the question whether any periods of delay occasioned by the defendant's filing of a motion as to one charge should also apply to a subsequently filed charge, specifically "whether R.C. 2945.72(E) applies where the filing of the motion [by the defendant] precedes the filing of the [supplemental] criminal charge."  *Homan* at 428.  Homan was initially charged with a DUI and filed a motion to suppress in connection with that charge.  She was subsequently charged with child endangering, and the state sought to apply the period of delay resulting from the motion to suppress filed in connection with the first charge to the subsequent charge.  Acknowledging that the extension of speedy trial time occasioned by R.C. 2945.72(E) is to be strictly construed in favor of the defendant, the *Homan* court concluded that "that tolling was not intended to occur for charges filed subsequent to the defendant's motion filing." *Homan* at 428.

{¶ **154**} The *Homan* court attributed its holding to the same reasoning it applied in *Adams*, 43 Ohio St.3d at 67, finding a defendant's waiver of his right to speedy trial as to an initial charge is not applicable to additional charges arising from the same set of facts that are brought subsequent to the waiver.  *Homan* at 428.  This is because the "objective underlying Ohio's speedy trial statutes [is to ensure] that the ability of a defendant to maintain his or her defense not be impaired." *Homan* at 428, citing *Adams* at 70.  It follows

that "knowing and intelligent tactical decisions cannot be made until all of the facts are known by the accused, and this, of course, includes knowing the exact nature of the crimes charged." *Homan* at 428, citing *Adams* at 70.

{¶ 155} Similar to its holding in *Adams*, the court in *Homan* found the "state's interpretation of Ohio's speedy trial law conflict[ed] with the objective sought to be achieved by the General Assembly," as it would "provide[] the state with an incentive to file charges piecemeal, as opposed to bringing all related charges at the same time." *Homan* at 428. The court reasoned that, with such application, "[t]he potential prejudice to defendants is manifest": "[w]hen a defendant is unaware of the precise nature of the crimes charged, he or she cannot make informed and intelligent tactical decisions about motion filings and other matters." *Id*.

{¶ 156} Significantly, *Blackburn* acknowledged and distinguished the holding in *Homan* by noting that, "[u]nlike Homan's **tactical** decision to file a motion to suppress, Blackburn filed the motion to continue the trial to allow his newly hired counsel time to prepare." (Emphasis added.) *Blackburn*, 2008-Ohio-1823, at ¶ 20. More broadly, *Blackburn* concluded that "[u]nlike waiver, statutory tolling **does not necessarily** require an informed, tactical decision." (Emphasis added.) *Id*. at ¶ 19.

{¶ 157} Upon careful review of applicable precedent, I would decline to expand the narrowly crafted holding in *Blackburn*. Although it is accurate to say that waiver differs from tolling, this distinction misses the crucial point that both methods stop the count for speedy-trial purposes. Whether a statutory tolling event should apply to the statutory speedy trial calculation for charges subsequently indicted turns, under the rationale of *Adams*, *Homan*, and *Blackburn*, on whether the tolling event required an informed, tactical decision.

{¶ 158} To be sure, R.C. 2945.72 provides, in relevant part, as follows:

> The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:
> . . .
>
> (E) Any period of delay **necessitated by** reason of a plea in bar or abatement, **motion**, proceeding, or action made or **instituted by the accused**;
> . . .

> (H) The ***period of any continuance granted on the
> accused's own motion***, and the period of any reasonable
> continuance granted other than upon the accused's own
> motion.

(Emphasis added.)

{¶ 159} For both of these statutory reasons, it is the defendant's own actions that cause the time to be tolled. In *Adams*, the Supreme Court reasoned that "a knowing and intelligent waiver cannot be made until all the facts are known by the accused, which includes knowing the exact nature of the crime he is charged with." *Adams*, 43 Ohio St.3d at 70. Knowing the exact nature of the crime(s) a defendant is charged with also undoubtedly affects which motions may be filed in a criminal case.

{¶ 160} For example, a defendant initially charged with misdemeanor assault against a live-in partner could file a motion in limine to exclude the admission of evidence concerning his prior misdemeanor conviction for domestic violence involving that same partner. Because the misdemeanor assault statute, R.C. 2903.13, only requires the state to prove that the defendant knowingly caused or attempted to cause physical harm to another, there may be a viable argument for excluding evidence of the defendant's prior conviction. However, if the charge is later dismissed by the state and indicted as felony domestic violence offense under R.C. 2919.25(D)(3) or (4)—thus requiring the state to prove a prior domestic violence conviction—the motion to suppress filed in the first case would no longer be appropriate. It stands to reason that, had such defendant been initially indicted with felony domestic violence, such motion would not have been filed. Holding otherwise is contrary to the legislature's objective in enacting speedy trial laws, and worse, would "provide[] the state with an incentive to file charges piecemeal, as opposed to bringing all related charges at the same time." *Homan*, 89 Ohio St.3d at 428.

{¶ 161} It is axiomatic, then, that a defendant's decision whether or not to file at least certain types of motions in a particular case—which will automatically extend the time period during which a trial must be held—is just as much a tactical decision as the decision whether to execute a waiver in a particular case. In either event, the result should be the same. Notably, other Ohio appellate district courts have declined to expand the Supreme Court's *Blackburn* holding in the manner the majority decision has done here. *See, e.g.*, *State v. Henrick*, 2010-Ohio-877, ¶ 16-28 (9th Dist.) (distinguishing *Blackburn* by noting

the court "declined to expand its holding to also address periods of delay within the context of an on-going case" and concluding it was not applicable to defense motions filed prior to the state's issuance of a supplemental indictment alleging additional charges in the same case); *State v. Konneh*, 2018-Ohio-1239, ¶ 36-46 (6th Dist.) (concluding *Homan* "remains good law" and finding defendant's filing of a motion to suppress in a forgery case was a "tactical decision" that occurred before he was indicted for possession of criminal tools in a separate case and, thus, "did not operate to toll the time for bringing him to trial on the possession-of-criminal-tools charge"). Thus, I write separately to express my concerns about the majority decision's overbroad application of *Blackburn* and to highlight the need for clarification from the Supreme Court on this issue.

{¶ 162} Ultimately, I dissent from the majority decision because it does not consider whether any of the tolling events from the 2020 case involved tactical decisions and thus should not apply to appellant's 2022 case. But, more predominately, I take issue with the trial court's failure to engage in this analysis at all.

{¶ 163} Appellant moved for discharge of the WUD charge on statutory speedy trial grounds on August 8, 2022. Months later, on March 6, 2023, the state filed its memorandum opposing the appellant's motion, summarizing the tolling events from the 2020 case it believed should apply to the 2022 case. This motion remained pending until the morning of June 5, 2023, when trial commenced.

{¶ 164} Before voir dire began, the trial court heard oral arguments on defense counsel's pending pre-trial motions, including the motion for discharge. In response to defense counsel's statutory speedy trial arguments, the trial court inquired: "What is his prejudice? . . . Because he was notified, or based on the police report, that he was cited under weapons under disability." (June 5, 2023 Tr. at 14-16.) True, constitutional[2] and statutory speedy trial rights are coextensive. But, the analysis relevant to each is different. Unlike the prima facie showing required for a statutory speedy trial violation, a constitutional speedy trial claim requires the trial court to conduct a factor-weighing

---

[2] The right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Ohio Constitution. *Adams*, 43 Ohio St.3d at 68; *State v. Taylor*, 2002-Ohio-7017, ¶ 32. The constitutional speedy trial guarantee was originally considered necessary to prevent oppressive pre-trial incarceration, to minimize the anxiety and concern accompanying public accusation, and to limit the possibility that a long delay will impair the ability of an accused to defend himself. *Adams* at 68.

analysis, which includes prejudice to the defendant. *See, e.g.*, *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *State v. Long*, 2020-Ohio-5363, ¶ 14.

{¶ 165} Just before trial began, defense counsel clarified that she was arguing for a *statutory* speedy trial violation, and the discussion proceeded as follows:

> **[DEFENSE COUNSEL]**: I don't think that when we are talking about statutory speedy trial, I don't think what we are talking about is whether there is prejudice or not. It is whether time is tolled or not, and it is not tolled.
>
> **THE COURT**: There is two. There is statutory and procedural.
>
> **[DEFENSE COUNSEL]**: Right.
>
> **THE COURT**: And so there is two sets of speedy trial. And if it is procedural, then he has to be prejudiced of some sort. And statutory is a specific, you know, 270 days or whatever as to that, whether the State has complied with that.
>
> But I don't know what his prejudice would be when he knew based upon the police report that he was subjected to a potential weapons under disability charge.
> . . .
>
> **THE COURT**: Any response from the State of Ohio?
>
> **[TRIAL PROSECUTOR]**: Your Honor, in regards to the -- do you want to do your other motion, too, or -- in regards to the speedy trial motion, I did file a written response. I refer the Court to, for the WUD charge, the statute of limitations is six years on that in terms of the speedy trial on the cases. In terms of the new case, he is definitely within the 270-day period. By my calculations he has 39 days of speedy trial spent on 22CR-1881.
> . . .
>
> I'm sorry. By my calculation, 39 days on 22CR-1881 has passed, as well as on 20CR-3790, there are 71 days that have passed of speedy trial; because since this case was indicted, the case has been continued numerous times by either of the parties. ***The speedy trial has been waived by both parties on the cases since 2020.***
>
> As the Court points out, he was initially charged with a WUD. There is no dispute that [the defense] was given a copy of his prior adjudication and conviction showing he was a WUD in initial discovery. And finally, when you look at the

Constitutional issue that the Court brought up about the length of the trial delay and the reason for the delay, what prejudice he suffered and the waiver he has done. In this case he has suffered no prejudice since he has had all of this information from the beginning.

Finally, the Court, I would just note that, you know, he has waived the case, the same facts and circumstances from the beginning. *He has waived speedy trial on all of the other charges but for this one because it was not indicted yet*. Now he is waiving -- he's bringing up a speedy trial issue.

[Defense counsel] does in her motion point out that it is a -- she didn't make the distinction. What she points out is that basically that the defendant's own actions in the old case can't affect speedy trial in the new case in terms of filing and delay for discovery or anything else. But those cases she cites do not address whether or not he has waived speedy trial to begin with. So based on the written motion that I filed, I ask the Court to deny their motion.
. . .

**[DEFENSE COUNSEL]**: And I would just like to note for the Court, the burden is not on the defense, it is on the State to strictly construe it against the State, and it is a question of whether -- I mean, the cases I cited are about whether they are tolling in a new charge, and time was not tolled. Thank you, Your Honor.

(Sic passim.)  (Emphasis added.)  (June 5, 2023 Tr. at 15-18.)

{¶ 166} At the conclusion of counsel's arguments, the trial court orally denied the defense's motion without explanation and did not subsequently issue a written decision explaining its findings of fact and conclusions of law as to its basis for denying the motion. (June 5, 2023 Tr. at 18.)  And although it is not entirely clear whether the trial court relied on the state's oral arguments, to the extent the trial court considered appellant's waiver in the 2020 case or failure to show prejudice as a basis for its decision, such considerations would have been improper.

{¶ 167} As the majority decision points out, a motion to dismiss involves a mixed question of law and fact.  (Majority Decision at ¶ 33.)  In the absence of any factual findings from the trial court determining and analyzing, *in the first instance*, the tolling events in the 2020 case—including whether they involved an informed, tactical decision, *see*

*Blackburn*, 2008-Ohio-1823, at ¶ 19—I would remand to the trial court for further proceedings. Most notably, I have concerns about the majority decision's apparent position that continuances agreed to by the parties ***for further negotiations*** would not fall within the ambit of "knowing and intelligent tactical decisions [that] cannot be made until all of the facts are known by the accused, and this, of course, includes knowing the exact nature of the crimes charged." *Homan*, 89 Ohio St.3d at 428, citing *Adams* at 70. (*Compare* Majority Decision at ¶ 45, 49.)

{¶ 168} For these reasons, I would sustain appellant's first assignment of error and remand this matter to the trial court for further proceedings consistent with this opinion and the controlling law in determining whether the state satisfied its burden of showing that the time for bringing appellant to trial for the WUD charge was properly extended under R.C. 2945.72.

{¶ 169} I also write separately to express my concerns with the process by which the state was permitted to amend the indictment filed in the 2020 case as to the aggravated riot charge. As the majority decision notes, Count 8 of the initial indictment filed on August 17, 2020 charged appellant with violating R.C. 2917.02(A)(2), alleging, in relevant part, that he (1) participated, (2) with four or more others, (3) in a course of disorderly conduct, as described in R.C. 2917.11, (4) with the purpose to commit or facilitate the commission of any offense of violence, ***to wit: Aggravated Robbery***, in violation of R.C. 2911.01. On June 2, 2023—the Friday before appellant's trial commenced on June 5, 2023—the state filed a motion seeking to amend Count 8 by adding the offenses of robbery, assault, and menacing after the "to wit: Aggravated Robbery" language in the initial indictment.

{¶ 170} On the morning of trial, before voir dire began, the trial court heard oral arguments from the parties on the state's motion. At that time, defense counsel opposed the proposed amendment to Count 8 on the grounds that the robbery, assault, and menacing offenses pertinent to the purposeful component of the aggravated riot offense had not been presented to the grand jury. (*See* June 5, 2023 Tr. at 10.) In support, defense counsel cited two decisions from the Eighth District Court of Appeals holding that because the state amended the indictments in those cases to reflect conduct that occurred over a range of dates rather than the single date presented to the grand jury, the amendments changed the identity of the crimes charged, in violation of Crim.R. 7(D). (*See* June 5, 2023

Tr. at 10-12, discussing *State v. Ketchum*, 2021-Ohio-1583 (8th Dist.), and *State v. Vitale*, 96 Ohio App.3d 695 (8th Dist. 1994).) Appellant restates this same argument on appeal.

{¶ 171} I concur with the majority decision's determination that the amendment to the indictment in this case did not change the name or identity of the charged aggravated riot offense. Unlike in *Vitale*, the amendment here did not add a separate crime or crimes occurring at a different time and place. The initial indictment alleged that appellant and others participated in a course of disorderly conduct with purpose to commit or facilitate the commission of any ***offense of violence***, in violation of R.C. 2917.02(A)(2). Although the initial indictment only specified aggravated robbery as the applicable offense of violence, "offense of violence" is defined in R.C. 2901.01(A)(9) to cover a wide range of conduct including felonious assault and robbery (with which appellant was also charged) as well as menacing and assault (misdemeanor offenses with which appellant was not charged).[3] Thus, the state's proposed amendment did not change the name or identity of the crime charged.

{¶ 172} But that determination ***should*** not end our analysis. When a trial court permits an amendment that does not change the name or identity of the offense charged, the accused is still entitled, ***upon motion***, to a discharge of the jury or to a reasonable continuance "unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury." Crim.R. 7(D). In reviewing a trial court's decision to allow a Crim.R. 7(D) amendment that did not change the name or identity of the crime charged, courts apply an abuse of discretion standard. *See, e.g.*, *State v. Smith*, 2004-Ohio-4786, ¶ 23 (10th Dist.). However, "[n]o action of the court in refusing a continuance or postponement under this division is reviewable except after motion to grant a new trial therefor is refused by the trial court, and no appeal based

---

[3] As the majority decision notes, assault is a lesser-included offense of felonious assault. (*See* Majority Decision at ¶ 106.) I would also note that menacing is an inferior degree of the indicted offense of felonious assault. " 'An offense is an "inferior degree" of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements.' " *State v. Franklin*, 2002-Ohio-5304, ¶ 73, quoting *State v. Deem*, 40 Ohio St.3d 205 (1988), paragraph two of the syllabus. Both offenses contain the mens rea of "knowingly." An actor commits felonious assault when he intends to ***cause serious*** physical harm to the victim, *see* R.C. 2903.11, whereas to commit menacing, the actor's intent is to scare or threaten the victim with physical harm, *see* R.C. 2903.22. These distinctions are merely mitigating elements.

upon such action of the court shall be sustained nor reversal had unless, from consideration of the whole proceedings, the reviewing court finds that a failure of justice resulted." Crim.R. 7(D).

{¶ 173} I write separately only to note that, because the state moved to amend the indictment on the Friday before trial, appellant may very well have been prejudiced by the "variance in respect to which the amendment [was] made" or that his rights may not have been "fully protected by proceeding with the trial" on June 5, 2023. Crim.R. 7(D). Indeed, any impact the state's proposed amendments may have had on defense counsel's trial preparation and strategy—namely, in relation to witness interviews, preparation, and subpoenas—would not likely have been easily remedied the weekend before trial. However, as the majority decision correctly notes, appellant's trial counsel did not move for discharge of the jury or a reasonable continuance, as required by Crim.R. 7(D), in response to the state's amendment. (Majority Decision at ¶ 105.) Appellant likewise does not argue on appeal that the amendment changed the way defense counsel prepared for trial. Nor does he contend his trial counsel was ineffective in failing to make such motion, seeing as his appellate and trial counsel are one and the same.

{¶ 174} Thus, I believe this court's analysis of appellant's fifth assignment of error should not be construed as affirmatively ***condoning*** the state's belated amendments to the indictment. Rather, having determined that the amendments to the aggravated riot count did not change the name or identity of the crime charged, we ***cannot evaluate*** the propriety of the trial court's decision to permit the amendment under the abuse of discretion standard because that issue was not raised in the trial court and, thus, is not properly before this court on appeal. (*See* Majority Decision at ¶ 105, quoting June 5, 2023 Tr. at 11.)

{¶ 175} I otherwise concur in the majority decision's analysis of the remaining assignments of error not impacted by the above.

_____